**Terry DENSON, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. WD 58017.**

Missouri Court of Appeals,
Western District.

Sept. 26, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 31, 2000.

Application for Transfer Denied
Dec. 5, 2000.

---

Vanessa Caleb, Asst. Public Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Adriane D. Crouse, Asst. Atty. Gen., Jefferson City, for respondent.

Before BRECKENRIDGE, P.J., ELLIS and EDWIN H. SMITH, JJ.

PATRICIA BRECKENRIDGE, Judge.

Terry Denson appeals from the judgment of the circuit court denying his motion for post-conviction relief pursuant to Rule 29.15 without an evidentiary hearing. On November 22, 1996, a jury in the Circuit Court of Jackson County found Mr. Denson guilty of murder in the second degree, § 565.021.1 RSMo 1994,[1] armed criminal action, § 571.015, and arson in the second degree, § 569.040. He was sentenced as a prior offender under § 558.016 to a period of life in prison for both murder in the second degree and armed criminal action, and to seven years for arson. The sentences for armed criminal action and arson were to run consecutive to the sentence for second degree murder.

On appeal, Mr. Denson claims that the motion court clearly erred in denying his Rule 29.15 motion without granting an evidentiary hearing. Mr. Denson's basis for post-conviction relief is that he was denied effective assistance of trial and appellate counsel. First, he claims that trial counsel failed to request instructions which would have submitted the issue of whether he killed Mary Brown while under the influence of a sudden passion. He also asserts that trial counsel failed to investigate and present fact and expert witness testimony that would have assisted in his defense. Finally, he claims that appellate counsel was ineffective for failing to assert error on appeal for the submission of an instruction on self-defense that was not supported by the evidence. Because Mr. Denson pled facts entitling him to an evidentiary hearing on his claim of ineffective assistance of counsel for failure to call an expert witness, that portion of the motion court's judgment is reversed and the cause is remanded for a hearing on that issue. His motion fails to set forth facts that entitle him to an evidentiary hearing on the remainder of his claims, so the motion court's denial of those claims is affirmed.

Accordingly, the judgment of the motion court is affirmed, in part, and reversed, in part, and the cause is remanded for an evidentiary hearing on the sole issue of whether trial counsel was ineffective for failure to call an expert witness to rebut the State's expert.

## Factual Background

Mr. Denson and Ms. Brown met in 1988 while both were working at Truman Medical Center. Soon after, Mr. Denson moved into an apartment with Ms. Brown and her son, Brian High. Over the next few years, Mr. Denson and Ms. Brown had two children, Terry B. Denson, Jr., and Tiara Denson. Although Mr. Denson described their relationship as "the American dream," there was evidence to the contrary. The police were called to their home several times. Specifically, in July 1990, police were called after Mr. Denson held Ms. Brown down on the bed, yelled at her, and chased her from their apartment with a knife. In December of that year, Ms. Brown told the police that Mr. Denson had struck her in the face and pushed her against the wall. Mr. Denson was taken into custody. When he was released later in the day, Mr. Denson, carrying a loaded weapon, entered their house by breaking in the frame of a door. He was arrested for the municipal offense of destruction of property for this conduct. In September of 1993, Ms. Brown obtained an ex parte order of protection against Mr. Denson, which ordered him not to stalk her.

In March 1995, Mr. Denson was upset because Ms. Brown had not been home all day, so he waited in their dark garage with an axe handle until Ms. Brown came home. When Ms. Brown got out of her car, he hit her on her head and back with an axe handle. Ms. Brown, who was covered with blood, ran from the garage into the street, with Mr. Denson chasing and hitting her with the axe handle. Quentin Canton, who was driving down the street, stopped to help her. Despite Mr. Canton's telling Mr. Denson to stop hitting Ms. Brown, Mr.

---

**1.** All statutory references are to the Revised Statutes of Missouri 1994.

Denson continued to strike her until Mr. Canton threatened to shoot him. Mr. Canton then took Ms. Brown to her mother's house, where she was taken to the hospital in an ambulance. Mr. Denson was convicted of misdemeanor assault for this incident.

In September 1995, Mr. Denson, Ms. Brown, and the three children were living at a house which Ms. Brown had rented in her name only. Ms. Brown's mother, Clarey Brown, and several other family members were staying at the house following the murder of Ms. Brown's brother in August 1995. The family members' presence in the house caused strain between Mr. Denson and Ms. Brown, and led to several arguments. In fact, Ms. Brown told Mr. Denson that she wanted him to move out of the house after he received his paycheck on September 29, 1995. Two days before he was supposed to move out, Mr. Denson told Ms. Brown's son, Brian, "I'm gonna kill your mama."

Around 11:00 A.M. on September 28, 1995, Mr. Denson and Ms. Brown got into an argument over which of them would drive Clarey Brown back to work from her early lunch hour. Mr. Delbert Smith, the owner of Ms. Brown's rental house, was in the house doing some repair work when he overheard this argument. Mr. Smith observed that Mr. Denson looked "very distressed." Mr. Denson finally agreed to take Clarey Brown to work, but he was angry and drove Ms. Brown's car recklessly. When Clarey Brown commented on his driving, he threatened to "tear up this MF." When she asked if Mr. Denson would tear up her daughter's car, he said, "You're hearing what you want to hear."

After taking Clarey Brown to work, Mr. Denson returned to the house, and the argument with Ms. Brown resumed. The argument escalated, and Mr. Denson accused Ms. Brown of sleeping around, including with her relatives. Their next door neighbor, Deborah Blake, and Ms. Blake's son overheard this argument, which was occurring in Ms. Brown's bedroom. Ms. Blake heard an "Uhh" like someone had been hit in the stomach. The argument then stopped. Ms. Blake next heard Mr. Denson say, "Bitch, bitch, bitch," but did not hear any other voices after that time. Soon after, Mr. Denson came out of the house, pulled the car into the garage and went back into the house. Later, Mr. Denson came back out of the house, got into the car, and drove away quickly. Ten or fifteen minutes later, Ms. Blake's son noticed that Ms. Brown's house was on fire, and Ms. Blake called 911. Ms. Blake also called Mr. Smith, who was the landlord for her home as well as Ms. Brown's, and tried to reach Ms. Brown by calling her home telephone and her pager. She did not answer.

The fire in Ms. Brown's house was reported at 12:22 P.M. The fire department found evidence that it was an incendiary fire, so the bomb and arson unit of the police department was dispatched to the house. A detective with the bomb and arson unit investigated and found burn patterns that indicated that the fire originated in Ms. Brown and Mr. Denson's bedroom, and that an accelerant like gasoline or kerosene was used to start the fire.

Originally, the police investigation focused on arson. When the police completed their initial investigation, they permitted Mr. Smith and his assistant to return to board up the house. In the course of doing that, Mr. Smith's assistant discovered blood on a phone book in the hall and on shoes and other things in a bag on the floor. They called the police. When the police arrived, they found blood in the hallway, den, dining room, kitchen, basement, and garage, and on two pair of shoes and a washcloth that were in a plastic bag. The officers then contacted the homicide unit.

Meanwhile, around 2:00 P.M. that same afternoon, Mr. Denson went to the Veterans Administration Hospital for treatment of a severe cut to his thumb. Due to the nature of Mr. Denson's injury, the hospital

staff contacted the police department. When Officer Steven Wilhoit asked Mr. Denson how he was injured, Mr. Denson told him that he was walking down Belmont between Truman Road and 14th Street when three men attacked him. According to Mr. Denson, the men struck him on the back of the head, hit him in the face, and struck him with an object, which cut his hand. Mr. Denson described the three men in detail, including their clothing and haircuts. Mr. Denson stated that he thought Ms. Brown, who he said was his wife, was responsible for or involved in the attack. He said he got away from the men and ran to his home. Although Officer Wilhoit did not see any cuts or bruises on Mr. Denson's face or head, he did observe a laceration in the palm of Mr. Denson's right hand that went completely through his hand into the web. Mr. Denson still had movement in his thumb, but the cut went almost to the bone, nearly severing his thumb. A nurse who treated Mr. Denson also noticed lacerations to his right and left index fingers.

After leaving the hospital, Mr. Denson called Ms. Brown's house. The police were still at the house investigating the fire, so Mr. Denson spoke with Detective William Martin. Mr. Denson asked Detective Martin why police officers were at the house. When Detective Martin told him that there had been a fire and the police were concerned about the whereabouts of Ms. Brown, Mr. Denson indicated that he had no knowledge of the fire or of the whereabouts of Ms. Brown and the children. Mr. Denson stated that he had not returned to the house after he took Ms. Brown's mother to work, but he did have Ms. Brown's car. According to Detective Martin, Mr. Denson told him that he was at the VA Hospital "getting his head straight." When Detective Martin said that he needed to speak with Mr. Denson, Mr. Denson agreed to wait at the hospital until he arrived. While he had Mr. Denson on the telephone, Detective Martin dispatched officers to the hospital. Mr. Denson was not at the hospital when the officers arrived, and a nurse said that Mr. Denson had left several hours ago.

Mr. Denson was not seen or heard from until October 4, 1995, six days after the fire, when he appeared at Terry, Jr.'s school and attempted to take his son. School officials had been notified to contact police if Mr. Denson came to the school. Terry, Jr.'s teacher attempted to detain Mr. Denson while police were called. When Mr. Denson insisted that he was leaving with his son, the principal instructed someone to call 911. Mr. Denson ran away, leaving Terry, Jr. behind.

Mr. Denson was arrested later that day. During the first hour of interrogation after his arrest, Mr. Denson maintained that he was attacked. He told a detective that he and Ms. Brown were arguing and he left to go to the store around the corner. He said that he was then confronted by three of Ms. Brown's friends, who rushed at him and asked if he was Ms. Brown's man. Mr. Denson stated that he returned home after that, but Ms. Brown was not there. He took Tiara with him, and dropped her off before he went to the VA Hospital to have his hand treated. Mr. Denson stated that he later called the house and found out that the house was on fire. When asked about the fire, he stated that Ms. Brown had probably left the stove on because she had done that in the past.

After the detective told Mr. Denson about the blood found in the residence, the location of the fire and other evidence, Mr. Denson then told the detective that Ms. Brown had attacked him and that he had gotten the knife from her and stabbed her. Mr. Denson gave a video-taped statement, and showed the detective where Ms. Brown's body was located.

An autopsy was performed on Ms. Brown's body on October 5, 1995. The autopsy revealed a stab wound to the upper abdomen, a stab wound to the left lower back, and some other small wounds. The stab wound to the upper abdomen was in the midline of the body and measured

about one and three-quarters inches in length and penetrated to a depth of about six and one-half inches. It was at a moderately sharp upward 30 to 45–degree angle extending into the chest cavity. It penetrated Ms. Brown's heart and aorta. The pathologist who performed the autopsy testified that this was the wound that caused death. Death from this wound would have occurred within a matter of minutes.

The wound to the left lower back was toward the side of Ms. Brown's body, about eight inches below the armpit. This wound was in an "L" or "T" shape. This would indicate that there had been at least two thrusts of a knife, with the blade angle changing, to cut this perpendicular wound. This wound was at about a 30 to 45–degree downward angle. In addition to the two major wounds, there were other defensive-type wounds to Ms. Brown's hand and wrist.

In addition to recovering Ms. Brown's body, the police also recovered her car. The police found blood on the trunk lid, the floor of the trunk, the back edge of the trunk, the rubber seal of the trunk and on a floor mat in the trunk. Blood was also observed on the gearshift lever next to the steering column, on the steering wheel and on a paper sack that was underneath the left front seat. The blood found on the gearshift and floor of the trunk was matched to Mr. Denson.

Because Ms. Brown's body was too decomposed to provide an adequate blood sample for DNA testing, a sample was obtained from Clarey Brown. This sample and a sample from Mr. Denson were compared with samples of the blood discovered in the hallway, den, dining room, kitchen, basement and garage and on two pair of shoes and a washcloth that were in a plastic bag. The knife that Mr. Denson admitted caused Ms. Brown's death was found on the kitchen counter. Although most of the samples taken were not sufficient for DNA testing, the blood sample taken from the handle of the garage matched Mr.

Denson and the blood sample taken from a telephone book found in the dining room floor matched the genetic profile of the offspring of Clarey Brown.

At trial, Mr. Denson testified that on the morning of September 28, 1995, he had gotten off work at 2:00 A.M. He was not able to get to sleep until around 4:15 or 4:30 A.M. Soon after, he was awakened by the commotion in the house as Ms. Brown's mother was getting the children ready for school. After Clarey Brown took the children to school, Mr. Denson was able to get some rest until Clarey Brown returned to the house, needing a ride back to work. Mr. Denson and Ms. Brown argued over who would take her back to work, and Mr. Denson finally agreed to do it. When he returned, he and Ms. Brown began arguing again. They argued about money and the overcrowded house. Mr. Denson accused Ms. Brown of "sleeping around" and made a statement about her "sleeping with her relatives." Their arguing continued, and each was calling the other names. Finally, Mr. Denson went into the bedroom, picked up his daughter, and turned on the television. He then set his daughter down and laid back on the bed. Mr. Denson stated that at that point, Ms. Brown came through the door with a knife and "slashed down at" him. He threw up his right hand to block the knife and the blade hit his hand, cutting his thumb. Mr. Denson jumped back and screamed "What are you doing?" Ms. Brown came at him again, and Mr. Denson stated that he tried to hold her off of him. Mr. Denson testified that he was "really scared of what she was doing" and did not have "any function of [his] right hand." They stumbled onto the bed and wrestled around on the bed. They then fell off of the bed, and Ms. Brown "stopped." Mr. Denson got up and went to the bathroom to get a towel to wrap up his hand. He went back into the bedroom and told Ms. Brown to get up, but she did not move. He touched her and

took her pulse. Mr. Denson testified that, at that point, panic and confusion set in.

Mr. Denson testified on cross-examination that he then went downstairs to the basement and got a green rug similar to one in the breakfast room. He pulled the car into the garage. He carried and dragged Ms. Brown through the den, dining room, and kitchen, and down to the basement and placed her in the trunk of her car. After placing Tiara in the car, he poured gasoline in the bedroom and started a fire. On his way out, he grabbed a change of clothes. He disposed of Ms. Brown's body in the woods, and covered her with the rug. Mr. Denson then changed his clothes. He dropped Tiara off at his sister's house, and went to the VA Hospital to have his hand treated. Mr. Denson and Tiara went to his friend's house, where they spent the night after he explained that he and Ms. Brown had had a fight and he could not go home. When he left the friend's house the next morning, Mr. Denson went to work to pick up his check and began driving, ultimately ending up in South Dakota. Somewhere in South Dakota, he discarded the bloody clothes that he was wearing when he fought with Ms. Brown. Mr. Denson testified that he returned to Kansas City on October 4 because he wanted to see his son and have his son with him.

In rebuttal, Mr. John Cayton, chief forensic firearm and tool mark examiner at the Regional Criminalistics Laboratory, Kansas City, Missouri, testified concerning the knife that Mr. Denson said Mr. Brown fell on during a struggle. The knife, an Old Hickory kitchen butcher knife, was recovered from the kitchen counter. Mr. Cayton testified that the knife was six inches long from wooden handle to the tip of the blade, and the widest point was 1 5⁄16 inches. This particular knife did not have a cross guard or hand guard. The cross guard, often present on combat or hunting knives, prevents the handle of the knife from going further into the wound and protects the person using the knife from being cut. Without a guard, when the knife is used in a confrontation, the person using the knife could be cut when the person's hand slipped down the blade. Mr. Cayton also testified that the depth of Ms. Brown's wounds indicated that the knife was thrust into her body beyond the length of the blade. Once the blade has opened up the track, the handle without a guard could follow to where the hand would cause it to stop. Mr. Cayton testified that he would expect that the frontal wound would have been at a downward angle if persons of the same height as Mr. Denson and Ms. Brown were facing each other and struggling for the knife as Mr. Denson had described. Mr. Cayton further testified that the wound to the victim's back was consistent with two distinct penetrating cuts in the same location. There was one thrust, a withdrawal and change in knife angle, and then another thrust. Mr. Cayton would not expect a knife to penetrate beyond the length of the blade from just rolling around, especially when there were two wounds on the opposite side of the body that are deeper in the same place.

Following the jury trial, Mr. Denson was convicted of murder in the second degree, armed criminal action and arson in the second degree. He was sentenced as a prior offender to a period of life in prison for both murder in the second degree and armed criminal action, and to seven years' imprisonment for arson. The sentences for armed criminal action and arson were to run consecutive to the sentence for second degree murder. His conviction was affirmed by this court in the summary order of *State v. Denson,* 966 S.W.2d 409 (Mo.App.1998). Mr. Denson then filed a motion for post-conviction relief pursuant to Rule 29.15 claiming, *inter alia,* ineffective assistance of trial and appellate counsel. This appeal follows the motion court's denial of his motion, without an evidentiary hearing.

## Standard of Review

In reviewing a denial of a motion for post-conviction relief, this court is limited to a determination of whether the findings of fact and conclusions of law are clearly erroneous. *Moss v. State,* 10 S.W.3d 508, 511 (Mo. banc 2000). Such a finding will be made only if, after a review of the entire record, the appellate court is left with a definite and firm impression that a mistake has been made. *Id.* An evidentiary hearing on a motion for post-conviction relief will be required if the movant satisfies three requirements: (1) the movant must plead facts, not conclusions, which, if true, would warrant relief; (2) the facts pled must not be refuted by the record; and (3) the movant must have been prejudiced. *Id.* When the basis for relief is ineffective assistance of counsel, the movant is entitled to an evidentiary hearing if the movant "allege[s] facts, not refuted by the record, showing that counsel's performance did not conform to the degree of skill, care, and diligence of a reasonably competent attorney and that movant was thereby prejudiced." *State v. Brooks,* 960 S.W.2d 479, 497 (Mo. banc 1997) (citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Prejudice is shown when the movant establishes "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Hall,* 982 S.W.2d 675, 680 (Mo. banc 1998), *cert. denied,* 526 U.S. 1151, 119 S.Ct. 2034, 143 L.Ed.2d 1043 (1999).

The performance evaluation is based upon the presumptions that the actions of trial counsel were trial strategy and that assistance was adequate and decisions were made "in the exercise of professional judgment." *Luster v. State,* 10 S.W.3d 205, 210 (Mo.App.2000). In showing prejudice, Mr. Denson must establish that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* Mr. Denson bears the burden of proving grounds for relief by a preponderance of the evidence. *Weston v. State,* 2 S.W.3d 111, 114 (Mo. App.1999).

## Trial Counsel Not Ineffective for Failing to Request "Sudden Passion" Language in Second Degree Murder Instruction and a Voluntary Manslaughter Instruction

Mr. Denson first claims that trial counsel was ineffective for failing to request instructions which would have submitted to the jury the issue of whether he caused the death of Ms. Brown while under the influence of sudden passion arising from adequate cause. He first claims that his counsel was ineffective for failure to request a voluntary manslaughter instruction as a lesser-included offense of murder in the second degree. He further claims that the instruction for second-degree murder should have been modified to include the "sudden passion" language contained in MAI–CR3d 313.04. Mr. Denson asserts that he was entitled to these instructions because Ms. Brown's actions in attacking him with a knife and severely cutting his thumb were adequate cause for his sudden passion, and that the jury could have found that he was acting under this sudden passion when he stabbed Ms. Brown, causing her death.

If there is evidence from which a jury could believe that a defendant was acting under the influence of sudden passion when the defendant killed the victim and the defendant's trial counsel requests instructions on sudden passion, the jury could find the defendant not guilty of second-degree murder and guilty of voluntary manslaughter. *See State v. Price,* 928 S.W.2d 429, 431 (Mo.App.1996). In *Price,* the court explained that the existence of sudden passion from adequate cause precluded a conviction for second-degree murder:

Sudden passion arising from adequate cause is a special negative defense to

conventional second-degree murder. It is an element of the crime and when properly introduced, it requires a finding by the jury that the defendant did not commit the murder under the influence of sudden passion to find the defendant guilty of second degree murder. Once a defendant has properly injected the issue of sudden passion, the state bears the burden of disproving it beyond a reasonable doubt. The defendant is entitled to have the jury consider voluntary manslaughter instead of second-degree murder when the defense introduces adequate evidence of the special negative defense.

*Id.* (citations omitted). A person commits the crime of voluntary manslaughter if the person "[c]auses the death of another person under circumstances that would constitute murder in the second degree under subdivision (1) of subsection 1 of section 565.021, except that he caused the death under the influence of sudden passion arising from adequate cause...." Section 565.023.1. "Sudden passion" is defined as "passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation." Section 565.002(7).

In this case, Mr. Denson testified at trial that he and Ms. Brown had been arguing that morning, and she attacked him with a knife. He then testified that she was killed while they were struggling over the knife. He relied upon this evidence to support a self-defense instruction, which he requested and the court gave. He asserts in his post-conviction motion that his trial counsel should have also requested that the jury instructions pertaining to sudden passion be given and that, if they had been given, he would not have been found guilty of second-degree murder. He asserts that the jury could have disbe-

lieved that it was necessary for him to kill Ms. Brown in self-defense, but believed that he killed her under the influence of sudden passion. At least one case supports a finding that this type of evidence would support the submission of instructions on the issue of sudden passion. *See State v. Fouts,* 939 S.W.2d 506, 511 (Mo. App.1997) (finding it was reversible error not to give instructions raising issue of sudden passion when husband testified that the injury he inflicted was in the heat of an altercation with his wife, even though husband denied strangling wife and testified that he was merely protecting himself from wife's attack).

■■■ Nonetheless, the sole issue before this court is whether trial counsel was ineffective in failing to request an instruction under the law in effect at the time of trial, so we need not decide whether the evidence supports the giving of instructions on sudden passion. Under current case law, a trial court is required to give an instruction on voluntary manslaughter and modify the language of the second-degree murder instruction when requested if there is evidence to support that the death of the victim occurred under the influence of sudden passion arising from adequate cause. *State v. Stanley,* 990 S.W.2d 1, 5 (Mo.App.1998). But at the time of Mr. Denson's trial, case law held that the theories of self-defense and sudden passion were mutually inconsistent if the same evidence or conduct was the basis for both theories. *State v. Jennings,* 778 S.W.2d 294, 296 (Mo.App.1989). Although the Missouri Supreme Court rejected this rationale in *State v. Redmond,* 937 S.W.2d 205, 209–210 (Mo. banc 1996),[2] that decision was handed down the month following Mr. Denson's trial. This court must look to the law as it existed at the time of trial when determining whether trial counsel was ineffective. *State v. Parker,* 886 S.W.2d 908, 923 (Mo. banc 1994).

---

**2.** The Court ruled that "[e]ach instruction should be evaluated separately and should be given if supported by the evidence, without regard to whether the other instruction is also being given." *State v. Redmond,* 937 S.W.2d 205, 210 (Mo. banc 1996).

"[F]ailure to predict a change in the law is not ineffective assistance." *Id.* Since the submission of a voluntary manslaughter instruction or a murder in the second degree instruction with the sudden passion language would not have been supported by the law existing at the time of trial, Mr. Denson's trial counsel cannot be found ineffective for failing to submit such an instruction.

The judgment of the motion court is affirmed with respect to trial counsel's failure to offer a voluntary manslaughter instruction or to request inclusion of the "sudden passion" language in the second-degree murder instruction.

### Trial Counsel was not Ineffective for Failing to Investigate and Present Fact Witnesses

Next, Mr. Denson claims that trial counsel failed to investigate and present the testimony of fact witnesses who would have assisted in his defense. Mr. Denson argues that trial counsel should have presented the testimony of Dr. Doug Burton, Dr. Barbara Erdwein and Nurse Nichole Foster, the medical personnel who treated his thumb at the VA Hospital. To establish that counsel was ineffective for failure to present witness testimony, Mr. Denson must show: (1) the witness could have been located through reasonable investigation; (2) the witness would have testified if called; and (3) the testimony would have provided a viable defense. *Williams v. State,* 8 S.W.3d 217, 219 (Mo.App.1999).

With regard to whether his counsel could have located the witnesses through reasonable investigation, Mr. Denson alleged in his motion that defense counsel had "notice of the potential testimony" from the police report of one of the detectives. Furthermore, Mr. Denson stated that trial counsel knew that the witnesses worked at the VA Hospital. He further alleged that they could have been subpoenaed, and that they would have been willing to honor the subpoena. Finally, Mr. Denson alleged that the testimony of these witnesses would have shown the extent of his injury and would have supported his self-defense claim. Specifically, Mr. Denson alleges that Dr. Erdwein or Dr. Burton would have indicated that his injury was one of the worst wounds they had seen that did not cut a tendon. He alleges that the doctors' testimony could have provided evidence of the extent of his injury and its effect on his ability to grasp objects with his right hand. Mr. Denson also argues that although a stipulation was read to the jury concerning Nurse Foster's observation of lacerations to Mr. Denson's right and left index fingers, the jury did not hear evidence concerning the extent of the lacerations.

At trial, Officer Wilhoit testified that when he went to the VA Hospital to investigate Mr. Denson's injury, he observed that the cut to Mr. Denson's thumb was quite deep and looked as if it was almost to the bone. On cross-examination, he agreed that the thumb was almost severed. The jury also heard the stipulation, read from Officer Wilhoit's report, that Nurse Foster had observed other lacerations to Mr. Denson's right and left index fingers. In addition to this independent testimony, Mr. Denson testified to the extent of his injury and to the presence of other "nicks and cuts" he received when he defended himself. This testimony provided the jury with sufficient evidence of the extent of the injury, as well as the existence of what he characterizes as defensive-type wounds. The testimony of the medical personnel would have been cumulative, and the failure to present cumulative evidence is not ineffective assistance of counsel. *State v. Johnston,* 957 S.W.2d 734, 755 (Mo. banc 1997).

Further, Mr. Denson fails to show how the testimony of the medical personnel could have provided any additional evidence to support his claim of self-defense. Mr. Denson's defense at trial was that Ms. Brown died because he reacted to being attacked and injured when Ms. Brown struck him with a knife. He asserts that

Dr. Burton, Dr. Erdwein and Nurse Foster would provide testimony in support of his defense, but he does not allege how evidence as to the general nature or extent of the injury to his thumb is supportive of his defense. The testimony Mr. Denson claims his counsel should have presented does not assist him in proving that his thumb was injured when he was defending himself against an attack by Ms. Brown, or disprove the State's theory that his injury occurred when his hand slipped down the blade of the knife as he was stabbing Ms. Brown. While Mr. Denson asserts that the evidence from the medical witness would support his testimony that he could not grasp the knife after his injury, this does not aid his defense. The State's theory was that Mr. Denson was injured in the course of stabbing Ms. Brown, so the fact that he would have trouble holding a knife after he had stabbed Ms. Brown would not benefit his defense. Accordingly, Mr. Denson failed to show that the testimony of the medical witnesses would have provided a viable defense.

The motion court's denial of Mr. Denson's claim of ineffective assistance of counsel for failure to investigate and call Dr. Burton, Dr. Erdwein and Nurse Foster as witnesses is not clearly erroneous.

## Mr. Denson Pled Sufficient Facts to Support a Claim of Ineffective Assistance of Counsel for Failure to Present Expert Witness

■ Mr. Denson next claims that trial counsel was ineffective for failing to investigate and present an expert witness to counter the testimony of the State's rebuttal witness John Cayton. Mr. Cayton testified that the injuries of the victim were inconsistent with Mr. Denson's account of the struggle.

■ To be entitled to a hearing on his claim, Mr. Denson must have alleged: (1) "that such an expert existed at the time of trial"; (2) that the expert "could have been located through reasonable investigation"; and (3) that the expert's testimony "would

have benefited movant's defense." *See* *State v. Davis,* 814 S.W.2d 593, 603–604 (Mo. banc 1991); *State v. Colbert,* 949 S.W.2d 932, 945 (Mo.App.1997). Mr. Denson pled in his motion that Dr. Jay Dix was a forensic pathologist at the University of Missouri–Columbia who has testified at numerous trials in the past. These facts, if true, sufficiently allege that an expert existed at the time of trial and that he could have been located through reasonable investigation. Mr. Denson further pled that Dr. Dix would have testified that Ms. Brown's wounds were consistent with Mr. Denson's testimony. Specifically, he alleged that:

Dr. Dix would have testified that, after reviewing the autopsy report and Movant's testimony, he concluded that the victim's wounds, given their locations, depth, and angles, were indeed consistent with Movant's account of the struggle. Dr. Dix would have been willing, ready and available to testify on Movant's behalf. The testimony of Dr. Dix would have changed the outcome of the trial by providing solid testimony that Movant's account was consistent with the physical evidence. Without Dr. Dix's testimony, the jury was left with John Cayton's uncontested opinion that Movant's account was not possible.

Mr. Denson also pled that in support of this claim he would present the testimony of Dr. Dix at the evidentiary hearing.

In rejecting Mr. Denson's assertion of ineffective assistance of counsel on this point, the motion court found that Mr. Denson was merely speculating as to what Dr. Dix would have said and that, in light of the overwhelming evidence against Mr. Denson, the expert testimony would not have exonerated nor have been "outcome determinative." The motion court appears to have understood the allegations of the motion to be that, if Dr. Dix were to review the autopsy report and Mr. Denson's testimony, it was anticipated that he would form an opinion that supported Mr. Denson's version of the events. The alle-

gations in the motion can also be read to assert that Dr. Dix has, in fact, reviewed the autopsy report and the testimony of Mr. Denson, and that Dr. Dix has expressed the opinion that Ms. Brown's wounds were consistent with Mr. Denson's version of the events of September 28, 1995. In determining whether Mr. Denson has alleged facts to support a claim for ineffective assistance of counsel, "allegations subject to differing interpretations must be considered in the light most favorable to the pleader." *Brown v. State*, 882 S.W.2d 154, 156 (Mo.App.1994). Therefore, the motion must be read to allege that Dr. Dix has reviewed the relevant materials and has expressed an opinion that would have benefited Mr. Denson's defense.

Defense counsel presented only the testimony of Mr. Denson with respect to the events that occurred on September 28, 1995. The additional witnesses were merely character witnesses. Arguably, the testimony of Dr. Dix would have provided the defense with supporting evidence of Mr. Denson's version of the events. Since Mr. Denson has identified an expert by name who could have testified and has shown that the testimony would have benefited his defense, he has met the burden necessary to warrant an evidentiary hearing on this point. At the conclusion of the evidentiary hearing, after the motion court observes Dr. Dix's testimony and hears his responses to cross-examination, the court can then determine whether Dr. Dix's testimony would have caused the result of the proceeding to be different. Without a hearing, this court cannot find that, as a matter of law, it would not.

The judgment of the motion court denying Mr. Denson's claim that his counsel was ineffective for failure to present the testimony of Dr. Dix was clearly erroneous and is, therefore, reversed. The cause is remanded to the motion court for an evidentiary hearing on that claim.

## Appellate Counsel was not Ineffective for Failing to Raise Alleged Instructional Error

■■■ Finally, Mr. Denson argues that appellate counsel was ineffective for failing to raise on appeal the properly-preserved claim that the trial court erred by refusing the defense version of the self-defense instruction and instead submitting the State's self-defense instruction that included "initial aggressor" language. Mr. Denson argues that the State presented no evidence to support the inclusion of the initial aggressor language, but only presented evidence that he had struck Ms. Brown in the past.

■■■ The standard for ineffective assistance of appellate counsel requires that the basis for the claim is such that "would have required reversal had it been asserted and which was so obvious from the record that a competent and effective lawyer would have recognized it and asserted it." *Moss*, 10 S.W.3d at 514. To be entitled to relief, Mr. Denson must show that "the error that was not raised on appeal was so substantial as to amount to a manifest injustice or a miscarriage of justice." *Id.* at 514–515.

Instruction No. 6, the instruction on self-defense, informed the jury that an initial aggressor is not justified in using force to protect himself from a counter-attack which the initial aggressor provoked. Specifically, the relevant portion of the instruction stated:

> One of the issues as to Count I is whether the use of force by the defendant against Mary Brown was in self-defense. In this state, the use of force including the use of deadly force to protect oneself from harm is lawful in certain situations.

> A person can lawfully use force to protect himself against an unlawful attack. However, an initial aggressor, that is, one who first attacks or threatens to attack another, is not justified in

using force to protect himself from the counter-attack which he provoked.

MAI–CR3d 306.06. The "initial aggressor" language is to be included only if there is evidence that defendant was the initial aggressor by first attacking or threatening to attack. Subsequent paragraphs in the instruction advise the jury that evidence of the prior relationship between the defendant and the victim may be considered in determining who was the initial aggressor.

Mr. Denson's allegation of ineffective assistance of counsel is based on his assertion that the only evidence of who initiated the attack is his direct testimony that Ms. Brown attacked him. Although there was no direct evidence that Mr. Denson first attacked Ms. Brown, there is circumstantial evidence sufficient to support the inference that he was the initial aggressor. For example, the prior relationship between Mr. Denson and Ms. Brown included several instances when Mr. Denson was the initial aggressor in attacking Ms. Brown when he was angry with her. On one occasion he was so angry that he beat her with an axe handle in front of two witnesses, and stopped only when one of the witnesses threatened to shoot him. Moreover, there was sufficient evidence to prove that Mr. Denson was angry with Ms. Brown on the day she was killed. He was angry because she gave her family permission to move into the house and their presence was disrupting his life. It is also reasonable to infer that he was angry that she was making him move out at the end of the week. His anger was apparent when he stated his intention to kill her to her son on the day before she was killed. In addition, he was angry with her immediately before she was killed because he was required to give her mother a ride to work.

Other evidence indicating that Mr. Denson was the initial aggressor was the testimony of Ms. Blake concerning the argument she overheard between Mr. Denson and Ms. Brown at the time Ms. Brown was killed. Ms. Blake's recitation of the argument is not consistent with Mr. Denson's claim that Ms. Brown initially attacked him. While Ms. Blake was not able to hear everything being said because water was running, she did hear the end of the argument. Of significance, she did not hear any screams by Mr. Denson, which he claimed he made in response to an attack by Ms. Brown. Instead, her testimony was that Mr. Denson and Ms. Brown were engaged one of their regular arguments when she heard an "uhh," like someone had been hit in the stomach. The only speech she heard after that sound was Mr. Denson calling Ms. Brown "bitch, bitch, bitch." Ms. Blake's testimony supports the reasonable inference that Mr. Denson was the initial aggressor, not Ms. Brown.

Moreover, Mr. Denson's behavior after Ms. Brown was killed is evidence of his consciousness of guilt. After Ms. Brown was killed, Mr. Denson immediately loaded her body in her car and set the house on fire, starting the fire in the bedroom where her death occurred. Mr. Denson then disposed of her body in the woods. When he went to the V.A. Hospital for treatment of his cut thumb and was asked how his thumb was injured by a police officer, he lied and claimed that three men attacked him. Later that evening when he called home, he lied to the police when he told them that he had not been home since he took Ms. Brown's mother to work and that he did not know anything about the fire or the whereabouts of Ms. Brown and the children. Mr. Denson further lied to his friend when he asked if he could spend the night because he and Ms. Brown had a fight. The next morning, he picked up his paycheck and then fled from Missouri. When he left town, he took his daughter, but he left his son behind without making any arrangements for his care. When he returned to Missouri and was arrested, he continued to lie to the police until he was confronted with the evidence that was contrary to his story. Only then did he tell the police that Ms. Brown had attacked

him and she had been killed when he was struggling to protect himself. This behavior by Mr. Denson would support the reasonable inference that he was guilty of attacking Ms. Brown, and was contrary to his version of the facts that she was the initial aggressor who attacked him.

This court has stated that "[u]pon contradictory evidence as to who was the initial aggressor, it [is] a question of fact and [is] properly submitted to the jury." *State v. Allison*, 845 S.W.2d 642, 647 (Mo.App. 1992). This court finds that the inclusion of the initial aggressor language in the self-defense instruction did not result in manifest injustice. Therefore, the decision of the motion court is affirmed with respect to Mr. Denson's claim of ineffective assistance of appellate counsel.

The judgment of the motion court is affirmed in part and reversed in part. The cause is remanded for an evidentiary hearing on Mr. Denson's claim that his trial counsel was ineffective for failure to call an expert witness.

All concur.