

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

_____

No. 08-24-00027-CR

_____

Patrick Adam Ortiz, Appellant

v.

The State of Texas, Appellee

On Appeal from the 226th District Court
Bexar County, Texas
Trial Court No. 2020CR2439

# MEMORANDUM OPINION[1]

A jury found Appellant, Patrick Adam Ortiz, guilty on one count of continuous sexual abuse of a child younger than 14 years of age and two counts of indecency with a child by contact and by exposure.[2] The trial court assessed punishment at 40 years' confinement for continuous sexual abuse of a child and five years for each count of indecency with a child. In several issues

---

[1] This case was transferred pursuant to the Texas Supreme Court's docket equalization efforts. Tex. Gov't Code Ann. § 73.001. We follow the precedent of the Fourth Court of Appeals to the extent it might conflict with our own. *See* Tex. R. App. P. 41.3.

[2] Because the complaining witness was a minor at the time of the offense, we refer to her by her initials, T.B., to protect her identity. *See* Tex. R. App. P. 9.10(a)(3). We refer to T.B.'s mother as Veronica, T.B.'s older sister as Cecilia, T.B.'s younger brother as A.O., and one of Cecilia's and T.B's cousins as A.S.

on appeal, Ortiz asserts (1) the trial court made harmful statements to the venire panel and the jury, (2) the indictment and jury charge contained egregious error, (3) the evidence is insufficient to support the verdicts, (4) he received ineffective assistance of counsel, (5) the State engaged in prosecutorial misconduct, and (6) his multiple convictions violate double jeopardy. We affirm.

# I. BACKGROUND

On January 16, 2024, a jury trial commenced at which several witnesses testified.

## A. T.B.'s testimony

T.B., who was 22 years old at the time of trial, testified she was born in July 2001. She said her mother's name is Veronica and she has several siblings, including her older sister Cecilia. She stated Ortiz is the father of her youngest brother (A.O.). T.B. said Ortiz came into her life when she was eight or nine years old and going into the fourth grade, at which time her family lived at the Leal house near her school, Ogden Elementary. T.B. attended Ogden Elementary from kindergarten through fifth grade. When asked how long Ortiz lived with her family, T.B. replied, "[h]e moved in going to fourth grade, and then we moved to the Kirby house when I was in the seventh grade. We were still living together. And then we moved out when I was going to high school."

One day, while in the fourth grade, T.B. stayed home from school because she was not feeling well after having taken the STARR test.[3] She said she and Ortiz were lying on the couch when Ortiz "started going into [her] underwear, and he started touching [her] inappropriately." When asked what she meant by "inappropriate," T.B. stated Ortiz "just went into [her] underwear and he started touching [her] vagina" with his fingers and he penetrated her vagina with his finger. She said he "just realized what he was doing, and he started apologizing and said he was sorry."

---

[3] T.B. clarified that the STARR test was a standardized test taken in elementary school and it would have been administered sometime in May of 2010.

She did not "know how to react" so she said "it's okay." She did not tell anyone because she was afraid. At the time, only she and Ortiz were in the house. T.B. later testified Ortiz "would touch [her] vagina mainly in the seventh and eighth grade."

T.B. said that after the first incident of touching her vagina, things "got worse." Ortiz started kissing her "inappropriately" by "putting . . . his mouth on [her] mouth and putting his tongue in [sic] [her] tongue and he was telling [her] how to kiss." She said he talked to her "inappropriately" by "try[ing] to tell [her] about the . . . birds and the bees when [she] was young." She said she was ten years old, in the fifth grade, and living at the Leal house.

In the sixth grade, T.B. attended Irving Middle School, at which time "it just started progressing more and more intense." She said "it got really bad" when the family moved to the Kirby house. At the Kirby house, when she was 11, 12, and 13 years of age, Ortiz started walking into the shower when she was showering and made her take pictures of her breast using his telephone. At other times, Ortiz would call her to the bathroom and open the door while he was naked, at which time, she saw his genitals. T.B. said Ortiz would grab her hand and "forcefully put [her] hand on his penis." When this happened, his penis "would grow" and he would get an erection. At this time, she was 12 and 13 years old.[4]

While in the eighth grade when she was 13 and living at the Kirby house, Ortiz put his mouth on her vagina while she was on her period. She said she remembered coming home and Ortiz "just randomly asked [her] if he could pleasure [her]." She told "him no, no, but he kept asking and asking" so she finally said yes. Ortiz also touched her breasts while they were living at the Leal house as well as when they were living at the Kirby house.

---

[4] T.B. agreed that the time between fourth grade, fifth grade, and middle school was more than 30 days apart, and "it started with the touching on the couch and then became worse" and those incidents were more than 30 days apart.

T.B. testified that from 2010 to about 2015, when she was in Ogden Elementary School and Irving Middle School, Ortiz lived with her family at the Leal house and the Kirby house, and the abuse happened from the fourth to the eighth grade.[5] When she was in the fifth grade, she finally told her mother that Ortiz was touching her. After she told her mother, her mother told her "to go to the room," and when she saw Ortiz "in there, he started crying" and he said, "Why would you lie?" T.B. said, "I just kind of apologized."

T.B. said Ortiz was no longer living with her family when she entered high school. T.B. stated the family moved back into the Leal house in 2015, and later the family moved to Nashville, Tennessee. T.B. testified about calling her mother, who was at work, to report that Ortiz broke into their apartment in Tennessee and kidnapped A.O. She said her mother called the police. When the police came to the apartment, T.B. told them Ortiz had broken into the apartment, pushed another of her brothers, and then took A.O. from her. She knew Ortiz had gone to court to obtain custody of A.O., but she was not aware of that information at the time.

T.B. eventually moved back to Texas to live with Cecilia and attend high school. She said she stopped attending high school during her senior year in 2019 when she was arrested for stealing from a store. That case was dismissed after she completed "some conditions." When asked if she told Cecilia about the abuse in 2019, T.B. said she told her cousin A.S., who told Cecilia. Cecilia then asked T.B. about it, and T.B. told Cecilia she was being sexually abused by Ortiz.

On cross-examination, T.B. again stated the abuse started when she was in the fourth grade at Ogden Elementary. At that time in her life, she had spoken with CPS several times because of

---

[5] T.B. testified that her mother and Ortiz broke up in the summer of 2015, but T.B. remained in contact with him through November 2016 because T.B. visited him along with her two younger brothers, one of whom was three-year-old A.O. She said Ortiz continued to touch her inappropriately during this time by putting his hand in her underwear to touch her vagina and in her shirt.

her biological father,[6] but she never mentioned Ortiz abusing her. She admitted she was asked if anyone was hurting her and she responded "no." T.B. admitted telling the prosecutors that her mother, and not Ortiz, was the person who accused her of lying about her outcry when she was in fifth grade. Although T.B. had earlier testified that she did not tell anyone about the abuse because she was afraid, she admitted she told a friend in middle school (seventh grade) about the abuse.

T.B. testified that in May 2020, her mother had a custody hearing during which she attempted to regain custody of A.O. T.B. admitted her mother wanted to use T.B.'s sexual abuse allegations against Ortiz in the custody proceedings.

Defense counsel asked T.B. about the statements she gave to the police regarding her allegations against Ortiz.[7] She remembered writing a statement and reading it, but she could not remember the name of the police officer who took the statement. She said she and Cecilia went to the police station where she gave both a written statement and a video-recorded statement.

### B. Cecilia's testimony

Cecilia was 24 years old at the time of trial. Cecilia said that in 2018, T.B. was living with their mother in Tennessee. In 2019, T.B. moved back to Texas to live with Cecilia because their mother thought it was best for her to do so. Cecilia said she lived within walking distance of a high school and "could keep an eye on [T.B.] and make sure she was going to school and stuff like that." According to Cecilia, T.B.'s mother was no longer involved in T.B.'s life at this time because she lived in another State, but they resumed their relationship in late 2019 or early 2020.

---

[6] T.B. was not asked why CPS was involved.

[7] T.B.'s testimony about her statements to the police are recounted in greater detail below in our discussion of Ortiz's contention that the State suborned perjury.

Cecilia said A.S. told her that she (Cecilia) should talk to T.B. and, when she did so, T.B. told Cecilia that Ortiz was putting his mouth on T.B.'s "private area." Cecilia testified that around this same time, T.B. had a lot of behavioral issues:

> [T.B.] was skipping school. She would stay at home. She wouldn't -- she didn't want to go to school, and she didn't really want to do anything. She would just stay in bed a lot of the time. Like, she wouldn't shower sometimes, too.
>
> And it got to a point where, you know, we had a -- had that conversation of, Hey, what's going on, like, Are you okay, You got to go to school, You can't just miss school because you want to. And, you know, we had that conversation.
>
> And then I did have to take her phone away. You know, she broke rules. So that was, in turn, for me to take her phone away from her. And at that point -- I think . . . shortly after that is when kind of everything came out.

Cecilia said she "grounded" T.B. and took her phone because T.B. was going out without Cecilia's permission, she was not going to school or doing her homework, and "an accumulation of other things that led up to that point." When Cecilia took T.B.'s phone, she discovered nude photos of T.B.'s breasts on the phone and it appeared T.B. was sending the photos to someone. When T.B. turned 18 years old, she moved out of Cecilia's home and moved in with a boyfriend.

After T.B. told her about Ortiz putting his mouth "on her private area," Cecilia went with T.B. to her school to speak with the counselor, who in turn told Cecilia to call the police. After Cecilia spoke to police officers, she went to police headquarters and gave a handwritten statement to Detective Vargas. When shown her statement, Cecilia admitted there was no mention of her conversation with A.S. She could not remember T.B.'s age when Ortiz came into T.B.'s life, but she knew T.B. was in elementary school.

## C. Veronica's testimony

Veronica testified that her family lived in the Leal house when T.B. was in the third and fourth grade, and Ortiz was her boyfriend at the time. Ortiz also lived with her and her family in the Kirby house. She and Ortiz were together for about four years and broke up in either 2014 or

2015. Ortiz is the father of her youngest son, A.O. While living at the Leal house, she worked Monday through Friday from 8:00 a.m. to 5:00 or 6:00 p.m. At the time, T.B. attended Ogden Elementary, which was less than a block away. When school ended at 3:00 or 3:30 p.m., T.B. walked home and was always the first to arrive at the house before her siblings. Veronica said Ortiz was self-employed, and sometimes he worked and sometimes he stayed at the house.

When the family lived at the Kirby house, T.B. attended Kirby Middle School where Veronica thought the school hours lasted until 4:00 p.m. She worked for a different company and her hours were longer; she would go to work as early as 6:00 a.m. and sometimes stay as late as 11:00 p.m. Ortiz also lived at the Kirby house. He worked "off and on," and there were times he and T.B. were alone.

Veronica testified that on March 13, 2017, when the family lived in Tennessee, Ortiz broke into her apartment and took A.O. When this happened, she was at work and T.B. called her. She left work to come home. She said she called the police, who came to the apartment and spoke to T.B., but by the time she got home the police had already left. When asked if she tried to file charges for burglary of a habitation and for kidnapping A.O, Veronica replied, "I believe so. I don't remember."

Veronica said her current husband was stationed in Maryland while she was living in Tennessee. When she decided to move to Maryland, she gave T.B. the choice to come with the family or return to Texas to live with Cecilia and complete high school. T.B. decided she wanted to finish school in Texas with her friends.

Veronica stated she never told T.B. what to say or how to testify. She also stated she never told T.B. what to say that might help in her custody dispute with Ortiz.[8]

---

[8] In November 2016, Veronica and her children moved to Tennessee. On January 31, 2017, a Bexar County, Texas district court entered temporary orders in a Suit Affecting the Parent-Child Relationship, appointing Ortiz and Veronica

7

**D. Detective Duane Vargas's testimony**

Vargas testified he had been with the San Antonio Police Department for 22 years and had been a Special Victim's Unit detective for the about ten to 12 years. He said the abuse was reported on February 19, 2019, and an officer was dispatched. He was later assigned the investigation into the allegations against Ortiz. He first met with T.B. when she came to the police station to give her statement. Vargas took a written statement from Cecilia and a video-recorded statement from T.B. He stated that his case file (or case jacket) contained everything involved in the case and did not contain a written statement from T.B. He explained that in his practice as a SVU detective, he did not take both a written and a recorded statement from a complainant. He said he would not have taken a witness statement from T.B., and if she testified that she gave him a written statement, that would be "incorrect." After Vargas took Cecilia's and T.B.'s statements, he contacted Ortiz to ask him to come to the police station to give a statement. Vargas's partner took the statement and Vargas later spoke to Ortiz a second time because Ortiz had a few follow-up questions.

**E. Officer Shane McCormick's testimony**

McCormick testified he had 22 years' experience in law enforcement and was presently working as a private school resource officer. In March 2017, when he was with the Nashville Police Department, he and another officer responded to a child abduction call reported as a car driving at a high rate of speed with an allegedly abducted child. When McCormick and another officer approached the car, Ortiz told them the child was his and he had the paperwork proving he had custody. Further investigation revealed Ortiz had custody of the child and was free to take him

---

as joint managing conservators of their five-year-old son, A.O., and granting Ortiz the exclusive right to determine A.O.'s primary residence without a geographic restriction. On February 27, 2017, Veronica lost custody of A.O. Veronica said she was not at the February 2017 hearing because she was not notified in a timely manner and she did not have the financial means to travel from Tennessee to Texas for the hearing. On May 1, 2020, Veronica filed a motion to modify the 2017 orders, asking that she be granted the exclusive right to determine A.O.'s primary residence. In her motion, she alleged Ortiz had engaged in a pattern of abuse toward A.O.'s "step-sister" for "a number of years." She stated Ortiz had been indicted and was free on bond.

back to Texas. McCormick's investigation also revealed no evidence of a burglary of a habitation. He said a colleague told him that A.O. was outside playing when Ortiz took him. He never spoke to T.B.

### F.  Dr. Heather Holder's testimony

Holder testified she was a board-certified forensic psychologist and had reviewed the State's file in T.B.'s case. She noted "a number of issues" around conflict within the family. She said another issue was that the longer the time between the alleged contact and the alleged outcry, "the less verifiable it is, [and] the more likely . . . the report can be contaminated by other things." Holder also said that each time a complainant makes an outcry, it can change a little bit and it "gets encoded in a person's memory so that the next time they report it, things have changed a little bit in what they report." Finally, she noted that Ortiz "adamantly denied that anything took place" and "mentioned multiple issues associated with the [complainant] and her family." Regarding finding inappropriate photos on someone's telephone, Holder said it "suggests that there's some other possible motivation for making a report of that nature"; it is "possible that . . . something took place, and it's also possible . . . individuals will kind of use . . . something that's happened to explain their behavior . . . that [the] family has found to be inappropriate essentially."

### G.  Jury charge and verdict

The charge instructed the jury of the three counts against Ortiz. Count I alleged he committed "the offense of continuous sexual abuse of a young child . . . on or about the 1st Day of May, 2010, through on or about the 30th Day of November, 2016[.]" Count II alleged he committed "the offense of indecency with a child by sexual contact . . . on or about the lst Day of November, 2013[.]" Count III alleged he committed "the offense of indecency with a child by exposure . . . on or about the 31st Day of January, 2012[.]"

9

A jury found Ortiz guilty on all three counts and the trial court assessed punishment.

## II. ISSUES ON APPEAL

On appeal, Ortiz asserts (1) the trial court made harmful statements to the venire panel and the jury, (2) the verdict and jury charge contained egregious error, (3) the evidence is legally and factually insufficient to support the verdicts, (4) he received ineffective assistance of counsel, (5) there was prosecutorial misconduct, and (6) his multiple convictions violate double jeopardy. We take Ortiz's issues out of order and address the issues together where possible.

## III. SUFFICIENCY OF THE EVIDENCE

In his third issue on appeal, Ortiz challenges the legal and factual sufficiency of the evidence in support of all three convictions.[9]

### A. Standard of review

When, as here, the State bears the burden to prove elements of an offense beyond a reasonable doubt, we may only conduct a legal sufficiency review. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (holding "legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt"). Under this standard, we consider the evidence in the light most favorable to the verdict and

---

[9] For the first time in his reply brief, Ortiz asserts Texas Code of Criminal Procedure Article 38.07(a) was not satisfied. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a) ("A conviction under Chapter 21, Section 20A.02(a)(3), (4), (7), or (8), Section 22.011, or Section 22.021, Penal Code, is supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person, other than the defendant, of the alleged offense within one year after the date on which the offense is alleged to have occurred."). "A new issue may not be raised for the first time in a reply brief." *Bruton v. State*, No. 08-11-00316-CR, 2013 WL 4029272, at *4 (Tex. App.—El Paso Aug. 7, 2013) (not designated for publication), *aff'd*, 428 S.W.3d 865 (Tex. Crim. App. 2014); *see Chambers v. State*, 580 S.W.3d 149, 161 (Tex. Crim. App. 2019) ("We agree with the courts of appeals that new issues raised in a reply brief should not be considered[.]"); Tex. R. App. P. 38.3. Therefore, we decline to address this complaint. Nevertheless, we note that Ortiz's argument ignores subsection (b), which states "[t]he requirement that the victim inform another person of an alleged offense does not apply if at the time of the alleged offense the victim was a person . . . 17 years of age or younger[.]"). Tex. Code Crim. Proc. Ann. art. 38.07(b)(1).

determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Garcia v. State*, 667 S.W.3d 756, 761 (Tex. Crim. App. 2023) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "A proper review of evidentiary sufficiency considers the cumulative force of the evidence." *Id.* at 761–62.

Viewing the evidence in the light most favorable to the verdict requires that we consider all of the evidence admitted at trial, including improperly admitted evidence. *See Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). As such, we defer to the factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *See* Tex. Code Crim. Proc. Ann. art. 36.13; *Garcia*, 667 S.W.3d at 762. This deference accounts for the factfinder's duties to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Garcia*, 667 S.W.3d at 761. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Garcia*, 667 S.W.3d at 762.

We treat direct and circumstantial evidence equally. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). It is not necessary that the evidence directly prove the defendant's guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013). Rather, circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and can, without more, be sufficient to establish his guilt. *Id.* A guilty verdict does not require that every fact must directly

and independently prove a defendant's guilt if the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

Finally, we measure the sufficiency of the evidence by the elements of the charged offense as defined by the hypothetically correct charge. *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016). In this regard, to determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt under the *Jackson* standard, we compare the elements of the offense to the evidence adduced at trial. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) (en banc)). The hypothetically correct charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

### B. Count I: continuous sexual abuse of a young child

The jury found Ortiz guilty on Count I, which alleged Ortiz committed "the offense of continuous sexual abuse of a young child . . . on or about the 1st Day of May, 2010, through on or about the 30th Day of November, 2016[.]" Ortiz asserts the evidence is insufficient to support the jury's verdict because the State failed to prove specific dates. Ortiz contends T.B. only remembered the "grades" she attended in school.

Although T.B. generally testified about what grades she was in when Ortiz assaulted her, the jury could reasonably infer the dates. T.B. was born in July 2001. She said she was eight or nine years old and going into the fourth grade, at which time her family lived at the Leal house near Ogden Elementary. Veronica testified her family and Ortiz lived in the Leal house when T.B.

was in the third and fourth grades. From this testimony, the jury could reasonably infer that T.B. was in the fourth grade and living in the Leal house in 2010. T.B. said Ortiz touched and penetrated her vagina when she was home after the STARR test, which was a standardized test taken in elementary school and administered sometime in May 2010.

T.B. said Ortiz put his mouth on her vagina while she was on her period when she was 13 years old, in the eighth grade, and living at the Kirby house. She testified that from 2010 to about 2015, when she attended Ogden Elementary School and Irving Middle School, Ortiz lived with her family at the Leal house and the Kirby house. T.B. said the abuse happened from the fourth to the eighth grade. From this testimony, the jury could reasonably infer that T.B. was 13 years old and in the eighth grade in 2014 when the assault occurred.

A jury is allowed to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319; *Garcia*, 667 S.W.3d at 761; *Clayton*, 235 S.W.3d at 778. Based on the evidence and reasonable inferences, a rational juror could have found the essential elements of continuous sexual abuse of a child beyond a reasonable doubt, i.e., that T.B. was under 14 years of age "at the time of the commission of each of the acts of sexual abuse[,]" which occurred "during a period . . . 30 or more days in duration." Tex. Penal Code Ann. § 21.02(b)(1), (2)(A).

### C. Counts II and III: indecency with a child[10]

Under Count II, the jury found Ortiz guilty of indecency with a child by sexual contact by touching T.B.'s breast with the intent to arouse or gratify the sexual desire of any person. Under Count III, the jury found Ortiz guilty of indecency with a child by exposing part of his genitals

---

[10] "A person commits [the offense of indecency with a child] if, with a child younger than 17 years of age, whether the child is of the same or opposite sex and regardless of whether the person knows the age of the child at the time of the offense, the person: (1) engages in sexual contact with the child or causes the child to engage in sexual contact; or (2) with intent to arouse or gratify the sexual desire of any person . . . exposes . . . any part of the person's genitals, knowing the child is present[.]" Tex. Penal Code Ann. § 21.11(a). "Sexual contact" includes, "if committed with the intent to arouse or gratify the sexual desire of any person . . . any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child[.]" *Id.* § 21.11(c)(1).

13

knowing T.B. was present and with intent to arouse or gratify the sexual desire of any person. Ortiz asserts the evidence is insufficient to support the verdicts because the State failed to prove the element of arousal or gratification.

"The specific intent required for the offense of indecency with a child may be inferred from a defendant's conduct, his remarks, and all of the surrounding circumstances." *Bazanes v. State*, 310 S.W.3d 32, 40 (Tex. App.—Fort Worth 2010, pet. ref'd); *C.F. v. State*, 897 S.W.2d 464, 472 (Tex. App.—El Paso 1995, no pet.) (same). In determining whether the evidence is legally sufficient to show a defendant's intent, "and faced with a record that supports conflicting inferences, we 'must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution.'" *Bazanes*, 310 S.W.3d at 40 (quoting *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991)). "It is well settled that a child complainant's uncorroborated testimony is, alone, sufficient to sustain a conviction for indecency with a child." *Heard v. State*, No. 08-21-00177-CR, 2022 WL 3572869, at *4 (Tex. App.—El Paso Aug. 19, 2022, no pet.) (not designated for publication); *Bazanes*, 310 S.W.3d at 40 (same). "The specific intent to arouse or gratify a person's sexual desire, no matter what the facts of the case, is a separate issue of fact when applied to two different types of conduct." *Ex parte Guinther*, 982 S.W.2d 506, 510 (Tex. App.—San Antonio 1998, no pet.).

Regarding indecency by contact, T.B. testified to numerous incidents of Ortiz touching her by "going into [her] underwear," touching her vagina, and penetrating her vagina with his finger; and "putting . . . his mouth on [her] mouth and putting his tongue in [sic] [her] tongue and . . . telling [her] how to kiss." She said he talked to her "inappropriately" by "try[ing] to tell [her] about the . . . birds and the bees when [she] was young." She said she remembered coming home one

14

day and Ortiz "just randomly asked [her] if he could pleasure [her]." Ortiz also touched her breasts while they were living at both the Leal house and the Kirby house. As for indecency by exposure, T.B. testified Ortiz would call her into the bathroom where he would be fully naked and she could see his genitals. She said he would grab her hand and "forcefully put [her] hand on his penis." When this happened, his penis "would grow" and he would get an erection.

Viewing all of the evidence in the light most favorable to the verdicts and deferring, as we must, to the jury's determination and evaluation of the witnesses' credibility and demeanor, we hold there was evidence and reasonable inferences upon which a rational trier of fact could have found beyond a reasonable doubt that Ortiz acted with the intent to arouse or gratify sexual desire by both contact and exposure. *See Weaver v. State*, No. 02-21-00081-CR, 2022 WL 2978730, at *9 (Tex. App.—Fort Worth July 28, 2022, pet. ref'd) (mem. op., not designated for publication) (concluding Weaver's conduct alone was sufficient to infer intent; jury heard testimony that Weaver's sexual conduct towards complainant "progressed gradually, from starting with massaging sore muscles, to asking her to take her shirt off so that he could massage her, to massaging her breasts over and under her clothes, and ultimately to fondling and penetrating her sexual organ"); *Pyeatt v. State*, Nos. 14-07-00269-CR, 14-07-00271-CR, 14-07-00272-CR, 2008 WL 442580, at *4 (Tex. App.—Houston [14th Dist.] Feb. 19, 2008, pet. ref'd) (mem. op., not designated for publication) (defendant exposed his genitalia to W.P. and told him to "come suck it"; concluding that on this evidence alone a rational trier of fact could have found the essential elements of felony indecency with a child beyond a reasonable doubt, including the element of specific intent to arouse or gratify). Furthermore, Ortiz's "repeat conduct gives rise to the conclusion that he acted with intent to arouse or gratify his sexual desire." *See C.F.*, 897 S.W.2d at 472.

### D. Conclusion

Concluding that the evidence is sufficient to support the jury's verdicts, we overrule Ortiz's third issue.

## IV. TRIAL COURT'S STATEMENTS

In his first issue, Ortiz asserts the trial court made improper statements to the venire persons during voir dire and to the impaneled jury during trial. Trial counsel did not object to any of the statements, but Ortiz argues the trial court's statements caused him egregious harm.

### A. Analysis

A trial court is prohibited from commenting on the weight of the evidence in criminal proceedings or otherwise divulging to the jury his or her opinion of the case. *See* Tex. Code Crim. Proc. Ann. art. 38.05 ("nor shall [the judge], at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case"); *Proenza v. State*, 541 S.W.3d 786, 791 (Tex. Crim. App. 2017); *Ruiz v. State*, No. 04-24-00204-CR, 2025 WL 871634, at *11 (Tex. App.—San Antonio Mar. 19, 2025, pet. ref'd) (mem. op., not designated for publication). "The fairness of a trial might be seriously questioned if the jury's perception of the trial judge is clouded with a suspicion that he is becoming an advocate for one side or that he is attempting to influence their judgment based on his unfavorable belief as to the credibility of a party or position." *Simon v. State*, 203 S.W.3d 581, 590 (Tex. App.—Houston [14th Dist.] 2006, no pet.). "Thus, a trial judge should not express an opinion on the weight of the evidence or imply in any manner that he believes or disbelieves the testimony of any witness." *Id.*

However, "[a] trial court has 'broad discretion in the manner it chooses to conduct voir dire, both as to the topics that will be addressed, and the form and substance of the questions that will be employed to address them.'" *Ruiz*, 2025 WL 871634, at *12 (quoting *Jacobs v. State*, 560

S.W.3d 205, 210–11 (Tex. Crim. App. 2018)). The complained-of comment must be such that it is reasonably calculated to benefit the State or prejudice the defendant's rights in order to constitute reversible error under Article 38.05. *Proenza*, 541 S.W.3d at 791.

Further, we do not consider a trial court's comments in isolation. In our assessment of whether a court's comments deprived an appellant of a fair and impartial trial, we consider the comments as a whole. *See Unkart v. State*, 400 S.W.3d 94, 101–02 (Tex. Crim. App. 2013) (reviewing the trial court's comments in light of the trial court's entire statement to the venire panel); *Infante v. State*, 397 S.W.3d 731, 738 (Tex. App.—San Antonio 2013, no pet.) ("Not[ing] the importance of viewing the surrounding statements of the trial judge and viewing the comment in context.").

Whether the trial court violated Article 38.05 is a question of law that we review de novo. *Costilla v. State*, 650 S.W.3d 201, 218 (Tex. App.—Houston [1st Dist.] 2021, no pet.). In evaluating a claimed violation of Article 38.05, we first determine whether the trial court's comments were, in fact, improper under the article. *Moore v. State*, 624 S.W.3d 676, 681 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd). If so, we must then decide whether the comments were material. *Id.*

**B. Alleged statements prioritizing speed over justice**

Ortiz first contends the trial court made statements that prioritized speed over justice; namely, "Trying to catch up," "IMPACT Court is designed for speed," and "I have a reputation of moving these cases fast." The trial court stated the following:

> Good morning, ladies and gentlemen. My name is Raymond Angelini. I was a Judge in the 186th District Court. Now I fill in from time to time when judges are on vacation, ill, or [at] seminars, and I also fill in -- this is an Impact Court. We're trying to catch up the cases because of the pandemic. It put things into the biggest mess you ever heard of. So we're trying to catch up, and that's why we're here in this courtroom today.

17

This is a Felony Impact Court. What we hear in this case -- in this courtroom are felonies. Felonies are those potential punishment -- where the potential punishment is time in the prison system for a period of time.

. . .

But to kind of let you know, we'll be out of here before 5:00 o'clock every day to try to get you on the road before the traffic gets bad, and especially in this situation when we might have ice on the roads and -- I hope not, but -- anyway. And so a short period lunch. I have a reputation of moving these cases -- moving them fast. And so I'll give you short breaks here and there, and we'll go from there. And I'll get you -- I know each and every one of you have a million places you'd rather be than here. I got it. But I'm going to make sure you -- we'll get this done as fast as we can making sure everybody here gets a fair trial.

The broader context of the court's statements indicate the court was merely informing the jury about a backlog of jury trials during the pandemic; therefore, he would move the case quickly by giving "short breaks" while still ensuring Ortiz received a fair trial. Because the court had discretion to move the trial expeditiously and the remarks do not indicate a lack of partiality, we conclude the remarks were not improper. *See Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001) ("trial judge has broad discretion in maintaining control and expediting the trial"); *Salazar v. State*, 298 S.W.3d 273, 280 (Tex. App.—Fort Worth 2009, pet. ref'd) ("But the trial court shall maintain an attitude of impartiality throughout the trial.").

### C. Alleged statements regarding Ortiz's guilt and the burden of proof

Ortiz next contends the trial court made the following statements that indicated the court believed Ortiz was guilty and that misinformed the jury about the standard of proof: "There is no definition of reasonable doubt"; "If you find him guilty beyond a reasonable doubt, you have to find him guilty"; and "To my own personal satisfaction he's guilty beyond a reasonable doubt." According to Ortiz, the court's statements were improper because the correct standard of proof requires the State to prove each element of an offense beyond a reasonable doubt. Ortiz mischaracterizes the court's statements, which were, in their entirety, the following:

18

Okay. There's also something you've all probably heard a million times in your life, in books, movies, TV, the State has the standard of proving this case against this man beyond a reasonable doubt. You probably heard that term a million times in your life. They have to prove this case "beyond a reasonable doubt."

Well, what does ["beyond a reasonable doubt"] mean? In the state of Texas, there is no legal definition for "beyond a reasonable doubt." "Beyond a reasonable doubt" means what it means to you, to each and every one of you. If I ask all 75 of you, what does that mean, we'll probably have 75 different definitions of "beyond a reasonable doubt," and they would all be correct.

The only thing you have to ask is -- yourself, Does what I hear from this witness stand show me to my own personal satisfaction that he's guilty beyond a reasonable doubt? And you will take an oath to return a verdict according to that.

So if you believe beyond a reasonable doubt -- you, personally, believe beyond a reasonable doubt that he's guilty of the crime, you have to find him guilty.

If you have a reasonable doubt thereof, or you think he's not guilty of the crime, you have to find him not guilty.

The State -- remember, he's not guilty. He's innocent of the crime until they prove otherwise. Okay? Everybody follow how that works?

That's how it works in every -- every state, Federal courts, everywhere. That's how it -- how it works and how it works -- has worked forever.

We conclude the trial court was not opining on Ortiz's guilt and did not improperly state the burden of proof. The court informed the jury that there was no legal definition of the term "beyond a reasonable doubt." *See Corley v. State*, No. 08-23-00318-CR, 2024 WL 4497982, at *6, n.3 (Tex. App.—El Paso Oct. 15, 2024, no pet.) (mem. op., not designated for publication) ("In a criminal trial, courts generally do not include a definition or instruction in the jury charge of the phrase 'beyond a reasonable doubt.' [citation omitted] Accordingly, each individual juror must decide what 'proof beyond a reasonable doubt' means and the amount of proof required to meet the beyond a reasonable doubt standard."). The court then properly instructed the jury on the burden of proof and that it was the State's burden. *See* Tex. Penal Code Ann. § 2.01 ("All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that he has been arrested, confined, or indicted for, or otherwise charged with, the offense gives rise to no inference of guilt at his trial.").

**D. Alleged "bantering" with the venire panel and misinforming the jury about the evidence it could consider**

Ortiz contends the trial court "bantered" with the venire panel regarding the type of sentence they could impose by asking "is he a bad guy," "was it horrible," and "is he a saint or a sinner?" Ortiz asserts the court suggested to the venire persons that they could project their own personal impressions on him with these comments. Ortiz's contentions take the court's comments out of context. They specifically regarded the punishment phase of trial and that, if the jurors were to find the defendant guilty, they would have to choose punishment within the prescribed range and would hear additional evidence in the second phase of trial so they would not have to decide punishment "in a vacuum." The comments in their entirety were as follows:

> So the legislature for a type of crime like this has determined that the -- the range of punishment for continuous sexual abuse of a child is anywhere from 25 years in prison to 99 years in prison. So should you find the person guilty of continuous sexual abuse of a child, you -- you then have to give him punishment from -- starting at 25 to 99. You pick a term of years. It could be 30 years, it could be 80 years, something like that. Okay? And you do it based not in a vacuum, but based upon what you hear from the witness stand.

> So to make that determination, you listen to evidence again, and you take into consideration what you found him guilty of. Was it horrible? Not bad? Is he a good guy? Is he a bad guy?

> The second phase of the trial, you may hear evidence about the background of the person. In the first phase of the trial, you hear evidence about the alleged crime, the allegations. In the second phase of the trial, you hear evidence about the background of the people involved: The good guys, the bad guys, that kind of thing, so you can make a determination of what -- how they should be punished. Does he have no record? Does he have a record a mile long? Is he a saint or is he a sinner? You hear all of that stuff, so you can make a proper determination of what the evidence -- I mean, what the punishment should be.

> Okay. Once again, you don't do that in a vacuum. And what your job to do -- if you find somebody guilty of continuous sexual abuse of a child, you have to give him somewhere in that range. And if you believe that he deserves 99 years, you give him 99 years. If you believe he deserves 25 years, then give him 25 years.

> Is there anybody here who cannot do that?

The trial court's statements were part of the court's description of the stages of trial (guilt/innocence and punishment) and the type of evidence they might hear during each stage. *See, e.g., Mason v. State*, 237 S.W.3d 800, 805 (Tex. App.—Waco 2007, pet. ref'd) (finding no error when trial court stated, in the context of explaining bifurcated trial phases, "[w]hether somebody's a good guy or a bad guy, you get to hear that later if we get that far"). We do not view the court's comments as "bantering" with the jury about the type of sentence to impose; instead, the court properly informed the jury about the range of punishment, instructed them to listen to the evidence presented, and cautioned them that no decision should be made in a vacuum.

Ortiz also contends the court "'grant[ed]' the jury a free pass to wield their prejudices and predispositions [by stating:] "You cannot set aside your convictions, it's an impossibility," "You're going to have that bias, you're going to have that prejudice." Again, these alleged comments are taken out of context. The trial court stated, in full, as follows:

> Some of you are more cynical, harsher, easier, nicer. So everybody in this room would look at a situation differently. And it -- that's why. And you're entitled to depend on your experiences in life to make any kind of decision. You're entitled to do that.
>
> You cannot set aside your convictions. It's an impossibility. But you have to be honest with yourself. You have to say, [d]espite my experiences in life, I'm going to be fair and I'm going to listen to the evidence and give it an honest assessment. You can't say, I'm going to find somebody guilty no matter what the evidence is; I'm going to find somebody not guilty, I don't care what the evidence is; I'm going to give them 99 years, I don't care what the evidence is; or I'm going to give them probation, I don't care what the evidence is.
>
> If you do any of those things, you're prejudging the case because you don't know what the evidence is. I don't know what the evidence is. Okay?
>
> So to be fair, you have to not prejudge anything. You have to keep an open mind through the whole thing and then give its honest value as you decide.
>
> We have experiences, and we all have prejudices and biases. Say, for instance, we were dealing with a possession of marijuana or possession of cocaine case. Some people believe possession of marijuana or cocaine should not be against the law, and that's fine. This is America. You can believe anything you want. But the issue in a case like that is: Did the State prove possession of cocaine, or did they not? Okay? Not whether it should be against the law or not.

21

We're not here for political discussion. We're here to determine whether the State has proven their case. Okay? So let's say you don't think cocaine should be against the law or marijuana or whatever. And this -- you believe -- the State don't prove it, you don't find him guilty just because you don't believe it should be against the law, that you're allowing your bias or your prejudice to enter into the decision-making process.

Or sometimes we hear child custody cases where there's an infant child involved. Some people believe the mother should always be given custodial custody of the infant child, and that's fine. You can believe that all you want. But you have to make a determination who is the better custodial parent from what you hear from the witness stand.

You're going to have that bias. You have that prejudice. But you have to be able to say, I'm going to be honest and assess the evidence as it comes out.

Is there anybody here who feels they could not do that?

We again disagree with Oritz's characterization of the trial court's remarks. We see nothing improper about the trial court acknowledging that everyone has their own experiences, and prejudices and biases, because "jurors are entitled to draw from their general life experiences when evaluating the evidence." *Najar v. State*, 618 S.W.3d 366, 374-75 (Tex. Crim. App. 2021); *see also Saenz v. State*, 976 S.W.2d 314, 322 (Tex. App.—Corpus Christi 1998, no pet.) ("Jurors are expected to draw upon their own experiences and common knowledge and apply them to the facts at hand."). Furthermore, the focus of the trial court's comments was on instructing the jury that, notwithstanding their personal experiences, biases, or prejudices, they were "here to determine whether the State has proven their case," and to do so they must listen to the evidence and give it an honest assessment.

Finally, Ortiz contends the trial court misinformed the jury that the only thing they could consider was "oral testimony" when there were exhibits admitted in evidence. Ortiz mischaracterizes the trial court's statements, which were made before any evidence was presented to the jury. The court stated as follows:

Okay. Please have a seat.

22

You've now been sworn as a jury to try this case.

By your verdict, you will decide the disputed issues of fact.

As I said before, I will be hearing the case for the first time just like you. The disputed issues of fact are -- the evidence will all come from the jury room -- I mean, this jury box right here. People swear to tell the truth, and that's what you are to consider. Therefore, that's the only thing you should consider.

So you're not to do any kind of research concerning this case. You are not to get on any kind of search engine, Google, anything like that and try to look up anything about this case.

All right. You're not to read anything in the newspaper concerning this case or watch anything on TV concerning this case -- I doubt it will be covered, but you never know -- or listen to anything on the radio concerning this case. If you should accidentally run across anything, I'm ordering you to disregard anything you may hear or read about this case.

Again, Ortiz mischaracterizes the court's instructions. Once the jury was seated, the trial court properly informed the jury that the evidence would come from the witness stand and they should not do their own research. The judge later addressed that the jury could consider "statements and reports received in evidence."

We conclude the court's remarks helped to guide jurors on their duties without improperly influencing their factual determinations or commenting on the weight of specific evidence.

**E.    Alleged theoretical scenarios on conviction and punishment**

Ortiz alleges the trial court made the following statements that amounted to "theoretical scenarios" on conviction and punishment; namely: "For the sake of argument you prove Counts 2 and 3"; "**You can find him guilty** of all 3 or any combination"; "You can find him not guilty of Count 2, **but he's guilty of Counts 1 and 3**"; "**You find him guilty of Count 2**, give him 10 years or more he does prison"; "Give him 2, 3, 4, 5, 6, 7, 8, or 9 years . . . should he get probation or community supervision"; and "You don't have to give probation, you can send him to prison," "Now I know some of you will never give anybody probation," and "Anything, never, period." Ortiz supports his contentions by citing generally to eight pages of the reporter's record. None of

23

these alleged statements are direct quotes of what the court actually said and most are merely a portion of a comment. Because Ortiz's alleged quotes from the record are inaccurate, we conclude this complaint is waived as inadequately briefed. *See* Tex. R. App. P. 38.1(g), (i).

### F. Ortiz's choice to testify or not

Finally, Ortiz alleges the trial court commented on Ortiz's absence from the witness stand during the punishment phase when the court stated, "Defendant has elected not to testify at sentencing." Ortiz contends this statement conveyed the impression that he "had something to hide." The trial court stated, in full, as follows:

> You are instructed that the Defendant may testify in his own behalf if he chooses to do so, but if he elects not to do so, that fact cannot be taken by you as a circumstance against him nor prejudice him in any way. The Defendant has elected not to testify in this punishment phase of trial, and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever.

We conclude the trial court properly informed the jury that Ortiz had the choice to testify or not and any decision on his part to not testify could not be used against him.

### G. Conclusion

After examining the trial court's comments, in their entirety and in context, we conclude that the remarks were not improper. "The trial court did not misstate the law, comment on the strength of the evidence or any legal theory advanced by [Ortiz], or otherwise prevent [Ortiz] from exercising his rights." *Ruiz*, 2025 WL 871634, at *12. Therefore, we overrule Ortiz's first issue.

## V. INDICTMENT AND JURY CHARGE

The indictment alleged Ortiz "did then and there, during a period that was thirty (30) or more days in duration, to-wit: from on or about the 1st day of May, 2010 through on or about the 30th day of November, 2016, . . . commit two or more acts of sexual abuse against A CHILD younger than fourteen (14) years of age[.]" In Ortiz's second issue, he asserts the indictment on

24

continuous sexual abuse was defective because T.B. was born in July 2001; therefore, the latter part of this time frame "would take [T.B.] out of the statute." Ortiz also contends the jury charge was defective for the same reason.

### A. The indictment

With an exception that does not apply here, "[t]he defendant in a criminal prosecution for any offense may waive any rights secured him by law[.]" Tex. Code Crim. Proc. Ann. art. 1.14(a). "If the defendant does not object to a defect, error, or irregularity of form or substance in an indictment . . . before the date on which the trial on the merits commences, he waives and forfeits the right to object to the defect, error, or irregularity and he may not raise the objection on appeal or in any other postconviction proceeding." *Id.* art. 1.14(b); *see also Teal v. State*, 230 S.W.3d 172, 177 (Tex. Crim. App. 2007) ("Thus, Texas law now requires the defendant to object to any error in the indictment before the day of trial and certainly before the jury is empaneled."). Ortiz concedes on appeal that trial counsel did not object to the indictment; therefore, he has waived this issue.[11] Even if Ortiz did not waive this complaint, we conclude, as discussed below, that he failed to show egregious harm.

### B. The jury charge

The charge informed the jury of the three counts against Ortiz. On appeal, Ortiz takes issue only with Count I, which alleged he committed "the offense of continuous sexual abuse of a young child . . . on or about the 1st Day of May, 2010, through on or about the 30th Day of November,

---

[11] Ortiz briefly states that "[N]otice of the charges must come from the face of an indictment alone"; however, he does not specifically assign error regarding lack of notice, nor does he brief the issue. Therefore, we do not consider whether Ortiz received notice of the offenses with which he was charged. *See* Tex. R. App. P. 38.1(i) (briefing requirements), (f) ("Issues Presented"); *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011) (holding that appellant's point of error was "inadequately briefed and presents nothing for review as this Court is under no obligation to make appellant's arguments for" him).

2016[.]"[12] The charge, which tracked Penal Code § 21.02(b)(1) and (2)(a), defined the offense of continuous sexual abuse of a young child as, "if during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, and at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and *the victim is a child younger than 14 years of age*" (emphasis added). *See* Tex. Penal Code Ann. § 21.02(b)(1), (2)(A).[13]

In reviewing claims of jury-charge error, we first determine if there was error, and then, if there was error, we decide whether the error caused sufficient harm to warrant a reversal. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (en banc). The amount of harm necessary to warrant a reversal depends on whether the appellant objected to the jury charge. *Id.* If the appellant preserved error with a timely objection in the trial court, the record need only show "some harm" to warrant a reversal. *Id.*; *Kuhn v. State*, 393 S.W.3d 519, 524 (Tex. App.—Austin, 2013, pet. ref'd). If the appellant did not preserve error, we will reverse only if the record shows "egregious harm." *Ngo*, 175 S.W.3d at 743–44. The record must show that the defendant suffered "actual, rather than merely theoretical, harm from a jury instruction error." *Id.* at 750. "Errors that result in egregious harm are those that affect 'the very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect a defensive theory.'" *Id.* (quoting *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996) (en banc), *overruled on other grounds by Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013)).

---

[12] For the first time in his reply brief, Ortiz asserts he was entitled to an instruction on unanimity and the jury was allowed to convict without a consensus. "A new issue may not be raised for the first time in a reply brief." *Bruton*, 2013 WL 4029272, at *4; *see Chambers*, 580 S.W.3d at 161; Tex. R. App. P. 38.3. Therefore, we decline to address this complaint.

[13] The offense of continuous sexual abuse of a young child does not have a period of limitations. *Moreno v. State*, 619 S.W.3d 754, 759 (Tex. App.—San Antonio 2020; no pet.); Tex. Code Crim. Proc. Ann. art. 12.01(1)(D) (providing "no limitation" for "continuous sexual abuse of young child or children under Section 21.02").

When the trial court asked if either side had any objections or deletions to the jury charge, Ortiz's counsel stated, "Not from the defense." Because Ortiz did not object to the jury charge at trial, his complaint on appeal is subject to an "egregious harm" analysis if he first establishes the existence of an error. We will assume without deciding that the jury charge was erroneous and consider only whether Ortiz was egregiously harmed.

The jury charge correctly defined the offense of continuous sexual abuse of a child regarding the age of the defendant and victim in the abstract portion of the charge (informing jury "the actor is 17 years of age or older and the victim is a child younger than 14 years of age"). Regarding the timing of the alleged offenses, the charge instructed the jury:

> The phrase 'on or about' means that the State is not required to prove that the alleged offense happened on the exact date alleged.
>
> Our law provides that the time of the offense alleged in the indictment must be some date anterior to the presentment of the indictment, and not so remote that the prosecution of the offense is barred by limitation.
>
> The indictment in this case was filed on March 12, 2020.
>
> There is no limitation period for the offense[] of continuous sexual abuse of a young child, aggravated sexual assault of a child, indecency with a child by sexual contact, and indecency with a child by exposure. The statute of limitation for the offense of sexual performance by a child is 20 years from the 18th birthday of the victim.

The charge alleged the offense was "committed on or about the 1st Day of May, 2010, through on or about the 30th Day of November, 2016." There is no dispute that T.B. was born on July 24, 2001, and turned 14 years of age in July 2015. Thus, Ortiz is correct that any offense committed after a date in July 2015 would not fall within the scope of § 21.02(b)(1) and (2)(a).

However, the application portion of the jury charge correctly instructed the jury that it must find that the conduct occurred when T.B. was less than 14 years of age. That portion of the charge stated:

27

Now, if you find from the evidence beyond a reasonable doubt that in Bexar County, Texas, [Ortiz] did then and there, during a period that was thirty (30) or more days in duration, to-wit: from on or about the 1st Day of May, 2010 through on or about the 30th Day of November, 2016, when [Ortiz] was seventeen (17) years of age or older, *commit two or more acts of sexual abuse against a child younger than fourteen (14) years of age*, namely: [Emphasis added]

- [Ortiz] did intentionally or knowingly cause the penetration of the sexual organ of [T.B.], a child who was *younger than 14 years*, by [Ortiz's] finger;

- [Ortiz] did intentionally or knowingly engage in sexual contact with [T.B.], a female child *younger than 14 years* by causing [T.B.] to touch part of the genitals of [Ortiz] with the intent to arouse or gratify the sexual desire of any person;

- [Ortiz] did intentionally or knowingly cause the penetration of the sexual organ of [T.B.], a child who was *younger than 14 years*, by [Ortiz's] mouth;

- [Ortiz] did induce a child *younger than fourteen (14) years of age*, namely: [T.B.], to engage in sexual conduct or a sexual performance, to wit: take photographs of her nude breasts, and [Ortiz] knew the character and content of said sexual conduct or sexual performance;

  Then you will find the defendant, [Ortiz], guilty of the offense of continuous sexual abuse of a young child as charged in Count I of the indictment.

Ortiz asserts he was egregiously harmed by the error in the jury charge because the State never provided any specific dates and, instead, T.B. merely referred to "periods of time." We disagree. As discussed above, we have concluded that, based on the evidence and reasonable inferences, a rational juror could have found the essential element of continuous sexual abuse of a child beyond a reasonable doubt, i.e., that T.B. was under 14 years of age "at the time of the commission of each of the acts of sexual abuse[,]" which occurred "during a period . . . 30 or more days in duration" during the period of May 2010 to before T.B.'s fourteenth birthday in July 2015. Tex. Penal Code Ann. § 21.02(b)(1), (2)(A). Therefore, Ortiz has failed to show he suffered actual, rather than merely theoretical, harm from a jury instruction error. *Ngo*, 175 S.W.3d at 750. Nor has he demonstrated that the charge error, if any, affected "the very basis of the case," deprived him "of a valuable right," or "vitally affect[ed] a defensive theory." *Id.* (footnote omitted).

Accordingly, we overrule Ortiz's second issue.

# VI. PROSECUTORIAL MISCONDUCT

In Ortiz's sixth issue, he asserts the prosecutor engaged in prosecutorial misconduct by (1) "act[ing] badly" during voir dire, (2) suborning perjury from T.B., and (3) misstating or inserting evidence that had not been introduced.

## A. Prosecutor's statements during voir dire

Ortiz contends the State "sought to 'commit' potential jurors to the type of evidence needed for conviction, and to the type of crimes at issue." According to Ortiz, the State appeared to "want jurors to 'make a statement' by convicting" him.

In his brief on appeal, Ortiz merely cited generally to five pages in the reporter's record and did not quote specific statements made or questions asked by the State. In his reply brief, he complains only about the following statements or questions by the State during voir dire: (1) "Is there anybody who gets upset when they hear about this type of crime in the community?" (2) "[I]magine a world where we, could only get jurors that were, like oh, you know what, I'm perfectly fine with these types of crimes happening in my community, and I don't get upset at it at all? Would that make sense? No." (3) "When we're thinking about sexual abuse cases, sexual abuse of children, do you expect to have that same type of evidence?" and (4) "So you won't expect—no camera footage, right?"

No objections were raised to these comments and questions; therefore, Ortiz has waived this issue on appeal. *See Garza v. State*, No. 04-10-00269-CR, 2011 WL 61724, at *4 (Tex. App.—San Antonio Jan. 5, 2011, pet. ref'd) (mem. op., not designated for publication) (appellant's failure to object on grounds of prosecutorial misconduct waived alleged error); *Perkins v. State*, 902 S.W.2d 88, 96 (Tex. App.—El Paso 1995, no pet.) (same); *see also Parker v. State*, 727 S.W.3d 38, 74 (Tex. Crim. App. 2025) ("The proper method of preserving error in cases of prosecutorial

29

misconduct is to (1) object on specific grounds, (2) request an instruction that the jury disregard the comment, and (3) move for a mistrial."). However, because trial counsel's failure to object is one of the bases on which Ortiz rests his ineffective assistance of counsel claim, we examine whether the State engaged in misconduct. "In determining whether a prosecutor's statements were improper, we consider the remark in the context in which it appears, examining the 'entire argument, not merely isolated sentences.'" *Martinez v. State*, No. 08-15-00124-CR, 2018 WL 3084147, at *3 (Tex. App.—El Paso June 22, 2018, no pet.) (not designated for publication) (quoting *Robbins v. State*, 145 S.W.3d 306, 314–15 (Tex. App.—El Paso 2004, pet. ref'd)).

Ortiz takes the complained-of statements and questions out of context, which were, in their entirety:

| [State]: | Right. Thank you for your answer. |
|---|---|
| | So who here -- is there anybody in this panel that likes this type of crime [sexual abuse of a child]? |
| | No. Is there anybody here on this panel that gets upset when they hear about this type of crime happening in their community? |
| | Please raise your cards. Right. |
| | So I ask that because -- does that mean, Okay, well, no one on the panel can hear this type of case? Juror Number 4, what do you think? |
| [Juror]: | Does that mean that no one can hear the case? No. |
| [State]: | Right. No, because imagine a world where we could only get jurors that were, like, Oh, you know what, I'm perfectly fine with these types of crimes happening in my community, and I don't get upset at it at all. Would that make sense? No. Right, Juror Number 4? |
| | So not liking something is very different from not being able to follow the law. Does that make sense, Juror Number 56? |
| [Juror]: | Yes, sir. |

.    .    .

| [State]: | So thinking about that, there's all that types of evidence. |
|---|---|
| | When we're thinking about sexual abuse cases, sexual abuse of children cases, do you expect to have that same type of evidence [referring to fingerprints or eye witnesses]? |

30

[Juror]:  There can be different type[s] of evidence.

[State]:  Right. Well, let's think about where do those types of cases happen. What are your thoughts, Juror Number 55?

The type of case where a child is sexually abused, right? That means an adult has decided, you know what, I'm going to sexually abuse that child. Do you expect, like in the airport example, that there are going to be a ton of witnesses?

[Juror]:  No.

[State]:  Why not?

[Juror]:  Probably something that happened in secret, behind closed doors, no eyewitnesses, no camera footage.

[State]:  So you won't expect -- no camera footage, right?

[Juror]:  Right.

[State]:  Because, like you said, it happens in secret, behind closed doors. Does it have to be someone that has access to the child?

[Juror]:  Reasonably, yes.

[State]:  Right. So you -- you play into kind of family dynamics, right, and those types of things, right, very different from the random crime that happens in broad daylight? Does everybody agree with that? . . .

That's why it's important to understand that testimony is evidence. Because if testimony was not evidence, that means there's a certain category of crimes that could never be prosecuted because, Juror Number 22, if that were the case -- well, testimony is just not good enough. That means a whole category of crimes would not be prosecutable. Does that make sense?

[Juror]:  Yes.

[State]:  Because that would mean, Well, I know this person is saying this and I believe them beyond a reasonable doubt that this crime was committed against them, but I need more than just their testimony.

Do you think that that's fair? Anybody here think that that's okay?

"Voir dire may . . . serve to prepare the jury for difficulties likely to be encountered in the case, to educate the jury on the applicable law, or to otherwise persuade the jury." *Brown v. State*, No. 03-06-00526-CR, 2007 WL 2214591, at *2 (Tex. App.—Austin Aug. 1, 2007, pet. ref'd) (mem. op., not designated for publication). However, an attorney may not attempt to bind or commit a prospective juror to a verdict based on a hypothetical set of facts. *Standefer v. State*, 59

31

S.W.3d 177, 179 (Tex. Crim. App. 2001). "Commitment questions are those that commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact." *Id.* "Often, such questions ask for a 'yes' or 'no' answer, in which one or both of the possible answers commits the jury to resolving an issue a certain way." *Id.* "A commitment question can also be a question that asks a prospective juror to *refrain* from resolving an issue on the basis of a fact that might be used to resolve the issue." *Id.* Also, although commitment questions are generally phrased to elicit a "yes" or "no" answer, "an open-ended question can be a commitment question if the question asks the prospective juror to set the hypothetical parameters for his decision-making." *Id.* at 180. Thus, "a question is a commitment question if one or more of the possible answers is that the prospective juror would resolve or refrain from resolving an issue in the case on the basis of one or more facts contained in the question." *Id.*

On the other hand, "[n]ot all commitment questions are improper." *Id.* at 181. "For example, questions concerning a juror's ability to consider the full range of punishment for a particular offense meet the above definition of commitment questions but are nevertheless proper." *Id.* "The distinguishing factor is that the law requires jurors to make certain types of commitments." *Id.* "When the law requires a certain type of commitment from jurors, the attorneys may ask the prospective jurors whether they can follow the law in that regard." *Id.*

After examining the prosecutor's comments, in their entirety and in context, we conclude the prosecutor's statements indicate he was informing the venire persons that they were required to remain fair and impartial, hold the State to its burden of proof without regard to their own personal experiences, and understand that testimony was evidence. Having reviewed the record, we cannot conclude that any statement or question by the prosecutor amounted to prosecutorial misconduct.

### B. T.B.'s alleged perjured testimony

A person commits perjury "if, with intent to deceive and with knowledge of the statement's meaning . . . [s]he makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath[.]" Tex. Penal Code Ann. § 37.02(a)(1). To suborn perjury, a party, acting with the intent to promote or assist a witness in committing perjury, must solicit, encourage, direct, aid, or attempt to aid the witness to commit perjury. *See Hardy v. State*, 246 S.W.3d 290, 295 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd); *see also* Tex. Penal Code Ann. § 7.02(a). Thus, "[t]he crime of subornation of perjury consists of two essential elements: commission of perjury by the person suborned, and willful procuring or inducing him to do so by the suborner." *See Butler v. State*, 429 S.W.2d 497, 501 (Tex. Crim. App. 1968) (citation omitted).

Ortiz points to three instances of T.B.'s testimony as support for his allegations the State suborned perjury. No objections were raised to any of the alleged testimony on the basis of perjury; therefore, Ortiz has waived this issue on appeal. *See Garza*, 2011 WL 61724, at *4; *Perkins*, 902 S.W.2d at 96. However, because trial counsel's failure to object is one of the bases on which Ortiz rests his ineffective assistance of counsel claim, we examine whether the State suborned perjury in each of the three instances.

### (1) T.B.'s outcry

Ortiz first contends that T.B. claimed she made an outcry to her mother. Ortiz asserts this "is false because [Veronica] never mentioned that at all. Further, biological sister [Cecilia] served as the adult 'outcry witness.'" During the outcry hearing and outside the jury's presence, T.B. testified that in 2019, while she was living with Cecilia, she told Cecilia that Ortiz had abused her. Cecilia later testified at trial about what T.B. told her. At trial, T.B. testified that when she was in

33

the fifth grade, she told her mother that Ortiz was touching her. We conclude Ortiz's contention that T.B.'s statement was false simply because Veronica never mentioned an outcry lacks merit. When Veronica testified at trial, neither the State nor the defense asked her whether T.B. told her about the abuse.

### (2) Written statement

Ortiz next contends that T.B. "claimed to have given a written statement to [p]olice," whereas "Detective Vargas stated that was false." According to Ortiz, "[b]y claiming she told her Mother about abuse, the State tried to lay a false foundation to give [T.B.] credibility."

During T.B.'s testimony, she was asked multiple times about giving oral and written statements to the police:

> Q. Okay. And do you remember talking to -- well, actually, let me ask you this way.
> Have you ever spoken to the District Attorney's Office about this case before you came in here to testify?
>
> A. Yes, ma'am.
>
> Q. How many times have you talked to them over the years?
>
> A. A few.
>
> Q. Okay. Because this case has been waiting for almost four years to go to trial, right?
>
> A. Almost five.
>
> .   .   .
>
> Q. Since you filed the police report?
>
> A. Yes, ma'am.
>
> Q. Okay. And then once [Ortiz] has been indicted, it's been almost four years.
>
> .   .   .
>
> Q. []. And when you met with the police officer to give your statement, you told the officer about this friend of yours [from the seventh grade], right?
>
> A. Yes, ma'am.
>
> .   .   .
>
> Q. Because several of the details -- oh, let me ask you this.

34

Did you review your statement that you gave to Detective Vargas -- have you reviewed that statement when you were talking with the Prosecutor?

A. No.

Q. You never reviewed it?

A. I didn't review it today, but I reviewed it in the past.

Q. You've reviewed it in the past?

A. Yes, ma'am.

Q. Okay. Did you just review the notes you took, the prosecution guide, or have you actually sat down and watched the video?

A. No. I haven't sat down and watched the video.

Q. Okay. Because -- so you just read -- you just reviewed what he wrote down?

A. I remember I wrote a statement, and I read that statement.

Q. You wrote a statement?

A. Yes, ma'am.

Q. In your own handwriting or was it typed and you signed it?

A. I believe it was my handwriting.

.    .    .

Q. Now, let's go back and talk about your written statement. You said that yesterday that you remember that you gave a written statement. Who did you give that written statement to?

A. To a police officer.

Q. To a police officer. Do you remember which officer you gave it to?

A. No, ma'am.

Q. Okay. Was it the police officer that made the scene and spoke with you and your sister at your high school in the counselor's office?

A. It may have been, but I don't think so.

Q. Okay.

A. I think it was somebody else.

Q. Because you and your sister, Cecilia, actually later went to police headquarters and you gave an over-an-hour audio-video statement to the detective, didn't you?

A. Yes, ma'am.

Q. Okay. Is that where you made the handwritten statement?

A. Yes, ma'am.

35

Q. Okay. So you made it on that day with Cecilia, correct? That's what you remember?

A. Yes, ma'am.

Q. Okay. Did you make it before your video interview or after your video interview?

A. I think it was before.

Q. You think it was before. Do you remember what the piece of paper looked like?

A. No, ma'am.

Q. Okay. Now, have you seen -- did you keep that statement?

A. No, ma'am.

Q. Okay. Have you seen that statement since you wrote it?

A. Yes, ma'am.

Q. Okay. When did you see it?

A. I seen it once before.

Q. And when was that?

A. Probably a couple of years ago.

.　　.　　.

Q. When -- at the end of your video statement, when you met with Detective Vargas in that room, he asked you, is there anything else you want to add to your statement before you guys left the room?

A. Yes, ma'am.

Q. Okay. And before you came in here to testify, had you reviewed your statement -- your audio-video statement with the Prosecutors? Have you watched the video?

A. No, ma'am.

.　　.　　.

Q. So the statement that you gave, do you remember what year that was?

A. I don't remember the year; I just remember the grade I was in. I was in fourth grade.

Q. Oh, I'm talking about the statement to police, the recorded statement.

A. 2019.

Q. What year was that?

A. 2019.

Q. 2019. Okay. And what year are we currently in?

36

A. 2024.

Detective Vargas testified that he investigated the case against Ortiz in 2019. He said he took a written statement from Cecilia and a recorded statement from T.B. He said his case jacket contained only T.B.'s recorded statement and not a written statement. He was then asked about his usual practice when taking statements. The testimony was as follows:

Q. And so typically in -- in your practice as a SVU detective, would it have been common for you to have -- or standard for you to have gotten a written statement and also a recorded statement from a complainant immediately after?

A. No, sir.

Q. Okay. So it would only have been the recorded statement?

A. Yes, sir.

.    .    .

Q. Okay. And so the first thing you did on this case was meet with [T.B.], correct?

A. Yes. She came to the headquarters to provide a statement.

Q. And you took that statement from her, correct?

A. Yes, ma'am.

Q. And in your prosecution guide, you have -- you have your notes from what you remember from the statement, and then you also turned over to the District Attorney's Office [T.B.'s] video recording statement?

A. Yes, ma'am.

.    .    .

Q. And in your training, were you taught to get multiple statements from a witness or try to get just the one statement from the witness?

A. Just the one statement.

.    .    .

Q. So by your recollection, you don't remember getting a witness statement from [T.B.], do you?

A. I don't remember, and I wouldn't do that. So --

Q. You wouldn't have done that, right?

A. No, ma'am.

37

> Q. Okay. So if she came in here and testified to this jury that she reviewed a witness statement that she wrote and gave to you, that would be incorrect, wouldn't it?
>
> A. Yes, ma'am.

Reviewing T.B.'s testimony in context, we conclude that, at most, there were only inconsistencies in her answers to some of the questions and nothing in the record supports a claim that she made a false statement with the intent to deceive. *See* Tex. Penal Code Ann. § 37.02(a)(1); *see also De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009) ("If the jury concludes that a [witness] honestly, though mistakenly, thought that his statement was true when he made it, then the jury could not find that he 'intended to deceive.'"). Therefore, we conclude none of T.B.'s answers rise to the level of perjury. Because we cannot conclude T.B. perjured herself, we likewise cannot conclude the State suborned any perjury on her part. *See Butler*, 429 S.W.2d at 501 (holding crime of subornation of perjury consists of two essential elements).

### (3) When Ortiz lived with the family

Finally, Ortiz accuses T.B. of "falsely testif[ying] that [Ortiz] lived with them until 2015[] [when] [s]he stated he stopped living with the family when she was 13 on Voir Dire."[14] According to Ortiz, "[b]y claiming Ortiz lived with the family longer than he really did, the State tried to create a false extension of fake abuse." T.B. said Ortiz lived at her house from when she was nine years old until she was 13 years old. T.B. was asked, "from 2010 to about 2015, when you're in elementary and middle school, you're living with [Ortiz]," and she replied, "Yes, sir." Defense counsel then asked:

> Q. And you told us the abuse stopped when [Ortiz] moved out of the home. Do you remember that?
>
> A. No, ma'am.

---

[14] T.B. testified outside the jury's presence during the outcry hearing.

Q.  Okay. When did your mother and [Ortiz] break up?

A.  They broke up in the summer of 2015.

Q.  2015 or 2014?

A.  2015.

Q.  Are you sure about that?

A.  Yes, ma'am. That's when we moved out.

Q.  Okay. So 2015. And when did you move to Tennessee?

A.  November of 2016.

As with our analysis above regarding T.B.'s testimony about providing a written statement to the police, we again conclude that, at most, there were only inconsistencies in her answers to some of the questions asked here and nothing in the record supports a claim that she made a false statement with the intent to deceive. *See* Tex. Penal Code Ann. § 37.02(a)(1); *see also De La Paz*, 279 S.W.3d at 344. Therefore, we conclude none of T.B.'s answers rise to the level of perjury. Because we cannot conclude T.B. perjured herself, we likewise cannot conclude the State suborned any perjury on her part. *See Butler*, 429 S.W.2d at 501 (holding crime of subornation of perjury consists of two essential elements).

### (4) Conclusion

Having reviewed the record, in its entirety and in context, we cannot conclude that any statement made by T.B. constitutes perjury suborned by the State. *See Hardy*, 246 S.W.3d 295 (explaining that to suborn perjury, a party with the intent to promote or assist a witness in committing perjury must solicit, encourage, direct, or attempt to aid the witness to commit perjury); *Butler*, 429 S.W.2d at 501 (holding crime of subornation of perjury consists of two essential elements). Accordingly, Ortiz's ineffective assistance claims could not prevail based on the failure to object to this testimony.

### C. "Inserting" improper evidence

Ortiz contends the State improperly proffered alleged acts of sexual abuse under § 21.02 after T.B. had turned 14 years old. Although we might be inclined to address the merits of this complaint because trial counsel's failure to object is one of the bases on which Ortiz rests his ineffective assistance of counsel claim, we decline to do so. Ortiz merely cites to a few pages in the reporter's record and does not point to the specific acts about which he complains. Therefore, he has waived his complaint as inadequately briefed. *See* Tex. R. App. P. 38.1(i); *Lucio*, 351 S.W.3d at 896.

Ortiz also complains the State misstated the evidence and "inserted" evidence that had not been introduced. No objections were raised; therefore, Ortiz has waived this complaint on appeal. *See Garza*, 2011 WL 61724, at *4; *Perkins*, 902 S.W.2d at 96. However, because trial counsel's failure to object is one of the bases on which Ortiz rests his ineffective assistance of counsel claim, we examine whether the State improperly "inserted" evidence.

All of the evidence to which Ortiz points consists of inconsistencies in T.B.'s testimony, her testimony about the grades she was in versus specific dates, or the manner in which the State phrased its closing argument. To the degree Ortiz complains of inconsistencies in T.B.'s testimony, we presume the jury resolved any inconsistencies in favor of the verdict and we defer to the jury's resolution of these matters. *Gutierrez*, 2023 WL 3730335, at *5; *Guerra*, 2023 WL 5508829, at *4. As to Ortiz's complaints regarding the dates of the abuse, as discussed above, we have concluded that a rational juror could have found the essential element of continuous sexual abuse of a child beyond a reasonable doubt, i.e., that T.B. was under 14 years of age "at the time of the commission of each of the acts of sexual abuse[.]" Tex. Penal Code Ann. § 21.02(b)(2)(A). Finally, Ortiz provides no authoritative support for his contention that the State made any improper remarks

40

during its closing argument. "Closing arguments must address 'matters that are in evidence or inferable from the evidence.'" *Ramos v. State*, No. 04-22-00240-CR, 2025 WL 700622, at \*5 (Tex. App.—San Antonio Mar. 5, 2025, no pet.) (mem. op., not designated for publication) (quoting *Milton v. State*, 572 S.W.3d 234, 241 (Tex. Crim. App. 2019)). Ortiz has not demonstrated how the State's remarks were not inferable from the evidence. For these reasons, we conclude Ortiz's complaint lacks merit.

### D. Conclusion

Concluding that Ortiz's complaints regarding alleged prosecutorial misconduct are unfounded, we overrule his sixth issue.

## VII. INEFFECTIVE ASSISTANCE OF COUNSEL

In Ortiz's fourth issue, he asserts trial counsel was ineffective for a variety of reasons. In his fifth issue, he asserts his first appellate attorney was ineffective for a variety of reasons.

### A. Trial counsel

Ortiz asserts trial counsel was ineffective because (1) she filed a "feeble" motion for new trial that did not cite any particular trial defect and was not presented to the trial court; (2) she did not call Ortiz to testify at trial; (3) during voir dire she suggested Ortiz might be guilty; (4) she failed to object to a defective indictment and jury charge; (5) she failed to object to improper statements made by the trial court; (6) she failed to object to prosecutorial misconduct; (7) she failed to use a "treasure trove" of discovery given to her by the State and failed to conduct adequate pretrial discovery; (8) she did not call family witnesses during the guilt-innocence phase; and (9) she did not file a speedy trial motion.

To prevail on an ineffective assistance of counsel claim, Ortiz must satisfy the two-element test set out in *Strickland v. Washington. See* 466 U.S. 668, 687 (1984). First, he must show trial

41

counsel's performance was deficient. *Id.* This element "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Counsel's representation is constitutionally deficient if the assistance falls below an objective standard of reasonableness. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). Conversely, counsel's representation does not fall below the objective standard of reasonableness simply because another would have selected a different trial strategy. *See Lopez v. State*, 343 S.W.3d 137, 142–43 (Tex. Crim. App. 2011). Whether counsel's performance falls within the bounds of the objective standard of reasonableness is judged by "the prevailing professional norms." *Id.* at 142.

Second, if Ortiz can show his trial counsel's representation was deficient, he must then show that counsel's deficient performance prejudiced his case. *Strickland*, 466 U.S. at 687. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "In other words, [Ortiz] must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Thompson*, 9 S.W.3d at 812.

Both *Strickland* elements "must be 'firmly founded in the record' and 'the record must affirmatively demonstrate' the meritorious nature of the claim." *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). Therefore, an appellant carries the burden to establish his claims by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998) (en banc). We strongly presume "that counsel's conduct falls within the wide range of reasonable professional assistance." *Robertson v. State*, 187 S.W.3d 475, 482 (Tex. Crim. App. 2006); *Johnson v. State*, 624 S.W.3d 579, 586 (Tex. Crim. App. 2021) ("A silent record that provides no explanation for

42

counsel's actions will not overcome the strong presumption of reasonable assistance."). Under this presumption, an ineffective assistance of counsel claim via direct appeal "is usually an inadequate vehicle" "because the record is generally undeveloped." *Goodspeed*, 187 S.W.3d at 392. "This is true with regard to the question of deficient performance—in which counsel's conduct is reviewed with great deference, without the distorting effects of hindsight—where counsel's reasons for failing to do something do not appear in the record." *Id.* To constitute deficient performance, "the challenged conduct [must be] so outrageous that no competent attorney would have engaged in it." *Id.* (internal quotation marks omitted); *see also Harrington v. Richter*, 562 U.S. 86, 105 (2011) ("An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve.").

### (1) Motion for new trial

Ortiz first alleges trial counsel was ineffective because she filed a "feeble" motion for new trial that did not cite any particular trial defect and was not presented to the trial court.[15]

Here, "[t]he record does not affirmatively show that counsel rendered ineffective assistance in connection with the trial, that he should have filed a motion for new trial raising such issues, or that after a hearing, the trial court would have granted a new trial." *Waddles v. State*, No. 05-01-00310-CR, 2002 WL 1308725, at *2 (Tex. App.—Dallas June 17, 2002, no pet.) (not designated

---

[15] The motion for new trial stated only that "[t]he verdict in this cause is contrary to the law and the evidence" and "[t]he trial court has the discretion to grant a new trial in the interests of justice[.]" *State v. Herndon*, 215 S.W.3d 901, 908 (Tex. Crim. App. 2007) ("While a trial court has wide discretion in ruling on a motion for new trial which sets out a valid legal claim, it should exercise that discretion by balancing a defendant's 'interest of justice' claim against both the interests of the public in finality and the harmless-error standards set out in Rule 44.2. Trial courts should not grant a new trial if the defendant's substantial rights were not affected. Otherwise, the phrase 'interest of justice' would have no substantive legal content, but constitute a mere platitude covering a multitude of unreviewable rulings." (internal citations omitted)).

for publication). Furthermore, "[a] motion for new trial was not necessary to preserve for appeal any of the complaints" Ortiz presents here, and he does not assert that he has been unable to properly present all his complaints to this Court. *Withrow v. State*, No. 01-93-00856-CR, 1996 WL 406449, at *1 (Tex. App.—Houston [1st Dist.] July 11, 1996, pet. ref'd) (not designated for publication). "Under the circumstances, failure of appellant's trial counsel to file a [more detailed] motion for new trial does not constitute ineffective assistance of counsel justifying reversal because appellant has not shown that he suffered any harm due to his counsel's failure to file such a motion." *Id.* In the absence of proof of prejudice, we cannot hold that the trial attorney's failure to file a more detailed motion for new trial amounted to ineffective assistance of counsel. *Bryant v. State*, 974 S.W.2d 395, 400 (Tex. App.—San Antonio 1998, pet. ref'd).

We conclude Ortiz's complaint fails because neither *Strickland* element was "'firmly founded in the record' and 'the record [did not] affirmatively demonstrate' the meritorious nature of the claim." *See Menefield*, 363 S.W.3d at 592.

### (2) Calling Ortiz as a witness

Ortiz next alleges trial counsel was ineffective because she did not call him as a witness during the guilt-innocence phase and punishment phase of trial. Ortiz does not state he asked to testify, does not state he discussed testifying with his attorney, and does not state what, if any, advice trial counsel gave him regarding testifying. Ortiz was required to establish through the record that he asserted his right to testify and that his attorney failed to protect that right. *See Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005) ("appellant's assertions in his brief on appeal, in the absence of anything in the trial record, are insufficient to show that he asserted his right to testify and his attorney failed to protect it"). Thus, Ortiz has failed to carry his burden to show trial counsel was ineffective. *See Walker v. State*, No. 01-02-00831-CR, 2003 WL

44

22413485, at *2–3 (Tex. App.—Houston [1st Dist.] Oct. 23, 2003, no pet.) (mem. op., not designated for publication) (refusing to speculate about counsel's reasons for not calling defendant to testify because "record is otherwise silent about whether appellant told counsel that she wished to testify and about the reasons that appellant's trial counsel did not call her to testify").

### (3) Counsel's statement during voir dire

Ortiz next alleges trial counsel was ineffective during voir dire because she suggested he might be guilty. Ortiz points to the following statement made by his attorney: "Now, once the State presents evidence, things may change, and we'll go through that in a bit. But, as we all sit here right now, my client is not guilty." During voir dire, defense counsel stated to the venire panel:

> So as the Judge stated, my client, as he sits here today, is presumed innocent. The Judge read you guys the definition. Because the State of Texas has not shown you any evidence -- there hasn't been testimony, there hasn't been bite marks, there hasn't been fingerprints, there's been no evidence presented, each and every one of you are all sitting at that table with [Ortiz]. We are all on team innocent, and we're in it together. Now, once the State of Texas presents evidence, things may change, and we'll go through that in a little bit. But as we all sit here right now, my client is not guilty.

It is clear, from the entirety of counsel's remarks and when taken in context, she was informing the venire panel that Ortiz was not guilty unless the State were to meet its burden. Furthermore, given the silent record, we will not speculate about the reasons counsel crafted her remarks as she did. *See Green v. State*, 191 S.W.3d 888, 894 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) ("An appellate court is not required to speculate on trial counsel's actions when confronted with a silent record."). Therefore, we conclude Ortiz's complaint fails because neither *Strickland* element was "'firmly founded in the record' and 'the record [did not] affirmatively demonstrate' the meritorious nature of the claim." *See Menefield*, 363 S.W.3d at 592.

45

### (4) Objection to indictment and jury charge

Ortiz next alleges trial counsel was ineffective because she failed to object to a defective indictment and jury charge. As discussed above, we have concluded that, based on the evidence and reasonable inferences therefrom, a rational juror could have found the essential element of continuous sexual abuse of a child beyond a reasonable doubt, i.e., that T.B. was under 14 years of age "at the time of the commission of each of the acts of sexual abuse[,]" which occurred "during a period . . . 30 or more days in duration." Tex. Penal Code Ann. § 21.02(b)(1), (b)(2)(A).

Also, as discussed above, Ortiz failed to show he suffered actual, rather than merely theoretical, harm from a jury instruction error and did not demonstrate the charge error, if any, affected "the very basis of the case," deprived him "of a valuable right," or "vitally affect a defensive theory." *Ngo*, 175 S.W.3d at 750 (citation omitted). Therefore, Ortiz has failed to establish that counsel's failure to object to the jury charge or indictment prejudiced his case or show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Thompson*, 9 S.W.3d at 812.

### (5) Objection to trial court's statements

Ortiz asserts counsel was ineffective because she failed to object to improper statements made by the trial court. After examining the trial court's comments in their entirety and in context, as discussed above, the failure to object cannot form the basis for ineffective assistance of counsel.

### (6) Statements made by the State

Ortiz asserts counsel was ineffective because she failed to object to prosecutorial misconduct. As discussed above, having reviewed the record in its entirety and in context, we cannot conclude that any statement or question by the prosecutor amounted to prosecutorial

46

misconduct. Therefore the failure to object in this regard cannot form the basis for ineffective assistance of counsel.

### (7) Use of discovery

Ortiz asserts counsel was ineffective because she failed to use a "treasure trove" of discovery provided by the State and failed to conduct adequate pretrial discovery. Ortiz contends counsel could have used T.B.'s medical and psychiatric records, CPS records concerning allegations against Veronica, and various other records. Ortiz's contentions require us to speculate about counsel's trial strategy, which we will not do when confronted with a silent record. *Green*, 191 S.W.3d at 894.

Ortiz also contends counsel failed to investigate the case and interview witnesses. "A claim for ineffective assistance based on trial counsel's general failure to investigate the facts of the case fails absent a showing of what the investigation would have revealed that reasonably could have changed the result of the case." *Cedillo v. State*, No. 04-22-00126-CR, 2023 WL 5945628, at *7 (Tex. App.—San Antonio Sept. 13, 2023, no pet.) (mem. op., not designated for publication). "Likewise, a claim for ineffective assistance based on trial counsel's failure to interview a witness cannot succeed absent a showing of what the interview would have revealed that reasonably could have changed the result of the case." *Id.*

Ortiz does not identify the witnesses counsel should have interviewed, nor does he explain what aspects of the case should have been investigated that were not. He also fails to explain what the missing evidence would have revealed that reasonably could have changed the result of the case. Therefore, we conclude Ortiz's complaint fails because neither *Strickland* element was "'firmly founded in the record' and 'the record [did not] affirmatively demonstrate' the meritorious nature of the claim." *See Menefield*, 363 S.W.3d at 592.

47

### (8) Calling family members as witnesses

Ortiz asserts counsel was ineffective because she did not call family witnesses during the guilt-innocence phase. Ortiz contends "several" family members were present at the trial and several had visited T.B.'s house and knew the layout of the house and about family interactions.

"An attorney's decision whether to call witnesses is generally considered a matter of trial strategy." *Walker*, 2003 WL 22413485, at \*2. In order to show that counsel was ineffective for failure to call witnesses, the evidence must show that the witnesses were available and the defendant would benefit from their testimony. *See King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983) (en banc). Ortiz does not identify these alleged witnesses, state they were willing and available to testify on his behalf, identify the substance of the testimony, or indicate how any such testimony would be beneficial to him. Because the record contains no such evidence, Ortiz has failed to show that his counsel was ineffective. *See Barraza v. State*, No. 08-98-00074-CR, 2000 WL 1367966, at \*3 (Tex. App.—El Paso Sept. 21, 2000, no pet.) (not designated for publication); *see also Ex parte McFarland*, 163 S.W.3d 743, 758 (Tex. Crim. App. 2005) (en banc) (appellant failed to show prejudice because he did not show unnamed witnesses were available to testify or that their testimony would have benefitted him). Further, Ortiz has not overcome the presumption that trial counsel's decision to not call any member of his family as a witness was reasonable or sound trial strategy. *Barraza*, 2000 WL 1367966, at \*3; *Johnson*, 624 S.W.3d at 586.

Accordingly, we conclude Ortiz's complaint fails because neither *Strickland* element was "'firmly founded in the record' and 'the record [did not] affirmatively demonstrate' the meritorious nature of the claim." *See Menefield*, 363 S.W.3d at 592.

48

### (9) Motion for speedy trial

Finally, Ortiz asserts that both attorneys who represented him at trial were ineffective because they did not file a speedy trial motion.[16] Ortiz was indicated in March 2020. The case was set for a jury trial on November 1, 2021. On October 26, 2021, his first attorney filed a motion for continuance in which he stated:

> Since trial resumed during the pandemic for the second time, counsel for Defendant is [sic] has been unable to tell which settings are actual trial settings with a jury panel. Counsel for the Defendant was unaware that there was a jury panel for the 226TH District Court on November 1 until last week. Counsel for Defendant has been preparing or trying the following cases . . .

Trial was reset for March 21, 2022, and, on March 16, 2022, Ortiz's same attorney filed a motion for continuance alleging:

> Jury trials in Bexar County have effectively been postponed due to the global pandemic for approximately two years (with a few weeks of trials when the pandemic appeared to be lessening). Jury trials began for the first time in 2022 on March 14, 2022. In the past when jury trials began only one district court was permitted to pick a jury each day, with each court having a jury panel approximately every 10 business days. Counsel for the Defendant received a schedule of district court jury panel availability for the week of March 14, 2022; however, the schedule only covered that week. This court had a jury panel on March 14, 2022. If the previous pandemic jury trial procedures were implemented, this court would not have a jury panel again until the week of March 28, 2022. Counsel was informed this week that on March 21,2022 this court would have a jury panel. Counsel has not secured the presence of necessary defense witness for the week of March 21, 2022.
>
> A new Assitant [sic] District Attorney has taken over the prosecution of this case. Counsel has just been conferring with the newly assigned prosecutor. The negotiations and discussions regarding a resolution to this case appear to be much more likely to result in a non-trial resolution than previous discussions with the former State's Attorney. Defendant would like an opportunity to continue these discussions for a few more weeks.
>
> Counsel for the Defendant was made aware of impeachment evidence in the form of prior crimes of moral turpitude by the complainant. Counsel brought this to the attention of the newly assigned State's attorney. The State's attorney is in the

---

[16] At trial, Ortiz had two attorneys represent him at different times. He originally retained Will Williams to represent him. Jessica Gonzalez, who represented Ortiz at trial, later substituted in as his attorney.

process of providing the requested documentation to counsel, and has no objection to the granting of this motion.

> The Defendant requests that the case be continued until at least April 4, 2022 . . . .

On August 24, 2022, the same attorney filed a third motion for continuance stating he was moving out of state and that replacement counsel would need time to prepare for trial. On September 7, 2022, a new attorney filed a motion to substitute in as Ortiz's counsel. Trial was set for October 31, 2022. On October 28, 2022, that attorney moved for a continuance asserting:

> The Defendant respectfully requests this Motion for Continuance in order to continue reviewing evidence and investigating the case. Defense provided the State with a hard drive on October 14, 2022 to downloaded [sic] the State's file to prepare for trial. At the time of filing this motion, the State has not given Defense that hard drive of discovery. Furthermore, the Defense requested a copy of the amended indictment and State has not sent a copy of the new indictment. Lastly, at the last conference, State was unsure if the CPS records from Tennessee have been requested and received. All of which are necessary for Defense attorney to review with Defendant to prepare for trial.

Trial commenced on January 16, 2024.

We first note there is no indication in the record that Ortiz asserted his right to a speedy trial and he does not contend that he did so. *See Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008) (Texas analyzes claims of a denial of the right to a speedy trial by weighing and balancing four factors, one of which is whether defendant asserted his right to a speedy trial during the period of delay). Second, although the record is silent regarding trial counsels' reasons for not filing a speedy-trial motion, it is clear from the record that trial counsel wanted or needed more time to prepare for trial. *See Walker v. State*, 201 S.W.3d 841, 850 (Tex. App.—Waco 2006, pet. ref'd) (noting possible reason for not asserting speedy trial violation is for counsel to have more time "to investigate the case, identify witnesses, and/or develop a defensive strategy for trial"). Additionally, the record demonstrates a delay in jury trials due to the pandemic and that defense counsel moved for multiple continuances.

The mere failure of counsel to file appropriate pretrial motions is not categorically deemed ineffective assistance. *Martinez v. State*, 824 S.W.2d 688, 690 (Tex. App.—El Paso 1992, pet. ref'd); *Jaile v. State*, 836 S.W.2d 680, 687 (Tex. App.—El Paso 1992, no pet.) (citing *Martinez* and holding "this rule applies to motions to dismiss for an alleged lack of a speedy trial"). With respect to the speedy trial issue, Ortiz has not overcome the presumption that counsels' representation was reasonable. *Robertson*, 187 S.W.3d at 482 (as an appellate court, we strongly presume "that counsel's conduct falls within the wide range of reasonable professional assistance").

## B. Appellate counsel

Ortiz asserts his first appellate counsel was ineffective because (1) he failed to present or amend his trial counsel's motion for new trial, and (2) he filed an *Anders* brief.[17]

Texas courts apply the same *Strickland* standard to claims of ineffective assistance of appellate counsel as they do to claims of ineffective assistance of trial counsel. *Ex parte Prince*, No. 05-05-00132-CR, 2005 WL 615729, at *3 (Tex. App.—Dallas Mar. 17, 2005, no pet.) (not designated for publication). Under this framework, the "appellant must show that appellate counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced appellant." *Id.* The appellant has "the burden of proving ineffective assistance of counsel by a preponderance of the evidence." *Id.*

Ortiz contends his first appellate attorney had a "real opportunity to amend [trial counsel's motion for new trial] if he found it lacking." Ortiz also contends that by not presenting the motion to the trial court, appellate counsel "ensured" the motion would be denied. For the same reasons

---

[17] Ortiz originally was represented on appeal by appointed counsel, Patrick Montgomery, who filed an *Anders* brief on Ortiz's behalf. Ortiz later retained Andres Cano, who filed a brief on the merits raising the issues we consider in this appeal.

stated above, we conclude Ortiz's complaint fails because neither *Strickland* element was "'firmly founded in the record' and 'the record [did not] affirmatively demonstrate' the meritorious nature of the claim." *See Menefield*, 363 S.W.3d at 592.

Ortiz also contends his first appellate attorney was ineffective because he filed an *Anders* brief. According to Ortiz, appellate counsel "are ineffective if they fail to raise a 'dead bang' winner[.]" Ortiz cannot show he was prejudiced by his first appellate attorney's filing an *Anders* brief because this Court granted Ortiz's newly retained appellate attorney's request to replace the *Anders* brief with a brief on the merits and we are considering the issues raised.

## C. Conclusion

We conclude that Ortiz has not satisfied his burden to show his attorneys "made errors so serious that [they were] not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" or that his attorneys' assistance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687; *Thompson*, 9 S.W.3d at 812. Therefore, we overrule Ortiz's fourth and fifth issues.

## VIII. DOUBLE JEOPARDY

The jury found Ortiz guilty of (1) continuous sexual abuse of a young child and (2) indecency with a child by sexual contact by touching T.B.'s breast with the intent to arouse or gratify the sexual desire of any person. In his seventh and final issue on appeal, Ortiz contends his Fifth Amendment right against double jeopardy was violated because he was charged with indecency with a child by touching, which is an underlying offense of continuous sexual abuse of a child. According to Ortiz, he was placed in double jeopardy by being charged with, convicted, and sentenced for both the primary offense under § 21.02 and a predicate offense under § 21.11.

"The Double Jeopardy Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, protects an accused from being punished more than once for the same offense in a single prosecution." *Carmichael v. State*, 505 S.W.3d 95, 100 (Tex. App.—San Antonio 2016, pet. ref'd). In this context, two offenses are "the same offense" if one is a lesser-included offense of the other, or if the Legislature has made it clear that only one punishment is intended for the two offenses. *Id.*

Penal Code § 21.11 provides that a "person commits [the offense of indecency with a child] if, with a child younger than 17 years of age, whether the child is of the same or opposite sex and regardless of whether the person knows the age of the child at the time of the offense, the person . . . engages in sexual contact with the child[.]" Tex. Penal Code Ann. § 21.11(a)(1). "'[S]exual contact' means the following acts, if committed with the intent to arouse or gratify the sexual desire of any person: (1) any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child; or (2) any touching of any part of the body of a child, including touching through clothing, with the anus, breast, or any part of the genitals of a person." *Id.* § 21.11(c).

One of the elements of continuous sexual abuse of a young child is that the person, "during a period that is 30 or more days in duration, . . . commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims[.]" *Id.* § 21.02(b)(1). The statutory language of § 21.02 "reflects that the Legislature clearly intended to disallow dual convictions for the offense of continuous sexual abuse and for offenses enumerated as 'acts of sexual abuse' when based on conduct against the same child during the same period of time." *Price v. State*, 434 S.W.3d 601, 606 (Tex. Crim. App. 2014) (citing Tex. Penal Code Ann. § 21.02(e)); *Carbajal v. State*, 659 S.W.3d 164, 184 (Tex. App.—El Paso 2022, pet. ref'd) (same);

*Aguilar v. State*, 547 S.W.3d 254, 263 (Tex. App.—San Antonio 2017, no pet.) (same). Except in a situation where different periods of time are involved, "a fact finder could find a defendant guilty either of continuous sexual abuse, or, alternatively, an enumerated act or acts of sexual abuse or a lesser offense or offenses of the enumerated act or acts." *Price*, 434 S.W.3d at 606.

Ortiz contends that because one of the "acts of abuse" under § 21.02 is indecency with a child under § 21.11(a)(1), he was subjected twice to punishment for the same offense. However, under § 21.02, "act of sexual abuse" includes "indecency with a child under Section 21.11(a)(1), if the actor committed the offense in a manner *other than by touching, including touching through clothing, the breast of a child*[.]" Tex. Penal Code Ann. § 21.02(c)(2) (emphasis added). "The act of touching the victim's breasts is specifically statutorily exempted from the corpus of conduct which can constitute continuous sexual abuse of a young child." *Van Nguyen v. State*, 699 S.W.3d 653, 657 n.2 (Tex. App.—Amarillo 2024, pet. ref'd). Therefore, "at least strictly in the statutory context, the touching of the breast constitutes an offense entirely separate from continuous sexual abuse of a young child." *Id.* at 656–57.

Thus, the act of touching T.B.'s breast, which constitutes the offense of indecency with a child by contact, "is not part of the acts which constitute both indecency with a child and the charged conduct of continuous sexual abuse of a young child." *Id.* at 656. Because Ortiz was charged with and found guilty of indecency with a child by sexual contact by touching T.B.'s breast, which is statutorily excluded from conduct constituting continuous sexual abuse of a young child, we do not find any double jeopardy violation on the face of the record. Accordingly, we overrule Ortiz's seventh issue.

## VIII. CONCLUSION

For the reasons stated above, we affirm the trial court's judgment.

LISA J. SOTO, Justice

May 4, 2026

Before Salas Mendoza C.J., Palafox, and Soto, JJ.

(Do Not Publish)